Caspar v. Lewin.

KATE CASPAR, *Appellee*, V. WILLIAM LEWIN *et al.,*
*Appellants.*

No. 16,504.

SYLLABUS BY THE COURT.

1. FACTORY ACT—"*Manufacturing Establishment.*"  Under sec-
tion 7 of the factory act (Laws 1903, ch. 356; Gen. Stat. 1909,
§ 4682), besides certain named establishments any other estab-
lishment is a "manufacturing establishment" wherein any
natural products or other articles or materials of any kind, in
a raw or unfinished or incomplete state or condition, are con-
verted into a new or improved or different form.

2. ——— *Same.*  An establishment wherein railroad iron, old
stoves, old waste iron and scrap iron of every description is
cut into lengths known as grade No. 1, grade No. 2, and
busheling scrap, by means of machines known as alligator
shears and operated by power, to meet standing specifications
of mills which purchase the product, is a "manufacturing es-
tablishment" within the meaning of the factory act.

3. ——— *Construction — Statute Not Adopted from Another
State.*  None of the sections of the factory act is a transcript
from the law of any other state and consequently had not been
given a settled and definite meaning by the highest court of
any other state when the statute was enacted.

4. ——— *Duty to Safeguard Machinery Not Limited to Work-
men Engaged in "Ordinary" Duties Only.*  Section 4 of the
factory act (Laws 1903, ch. 356; Gen. Stat. 1909, § 4679),
relating to safeguards for machinery and appliances, is not
limited in its application to workmen engaged in their or-
dinary duties only.  It is designed to protect persons employed
or laboring in manufacturing establishments while in the per-
formance of any duty, whether ordinary and general or excep-
tional and occasional.

5. ——— *Common-law Duty of Master Supplanted by Statutory
Duty.*  The factory act ignores the common-law duty resting
on the factory owner or operator to exercise reasonable care
to prevent foreseeable injuries and establishes a statutory
measure of prudence, by making specific precautionary re-
quirements relating to specified places, structures and appli-
ances; and in an action founded on the act for damages con-
sequent upon injuries to an employee acting in the scope of
his duty, caused by the absence of a prescribed safeguard, it is
no defense that the injury could not, with reasonable pru-
dence, have been anticipated.

Caspar v. Lewin.

6. ———— *Statute Can Not be Evaded by Rules Relating to Use of Machinery.* The protection of the factory act extends only to persons acting within the scope of some employment or labor. But the factory owner can not evade the requirements of the act, as that belt shifters shall be provided, by means of rules or instructions relating to the use of appliances, as that belts shall be shifted only while the machinery is not in motion.

7. ———— *Contributory Negligence of Injured Employee No Defense to Action under the Statute.* The civil action for damages authorized by the factory act is not a common-law action, but is a statutory remedy for the enforcement of a positive duty enjoined by law in the interest of the public welfare, and the contributory negligence of the injured employee or laborer is not a defense to such an action. The first paragraph of the syllabus of *Madison v. Clippinger*, 74 Kan. 700, is overruled.

8. ———— *Constitutionality—Police Regulation.* The factory act falls within the legitimate scope of the police power of the state, and the remedy prescribed for its enforcement is not obnoxious to either the state or the federal constitution.

9. ———— *Evidence Sufficient to Establish Liability in the First Instance.* Under section 6 of the act (Laws 1903, ch. 356; Gen. Stat. 1909, § 4681) it is sufficient, in order to establish liability, for the plaintiff to prove, in the first instance, that death or injury resulted in consequence of failure to provide the required safeguards, or that failure to provide such safeguards directly contributed to such death or injury, and it is not necessary for the plaintiff to go further, in those cases where the subject is pertinent, and prove the practicability of such safeguards. The third paragraph of the syllabus of *Henschell v. Railway Co.*, 78 Kan. 411, is overruled.

Appeal from Wyandotte court of common pleas. HUGH J. SMITH, judge. Opinion filed June 11, 1910. Affirmed.

*Jules C. Rosenberger, Clyde Taylor,* and *Kersey Coates Reed,* for the appellants.

*John T. Sims,* and *Angevine, Cubbison & Holt,* for the appellee.

The opinion of the court was delivered by

Burch, J.: Tony Caspar was an employee of the defendants, and while at work for them in their establishment suffered injuries which resulted in his death. The plaintiff, his widow, as administratrix of his estate, sued the defendants for the consequent damages in an action founded upon the factory act. She recovered, and the defendants appeal.

The act referred to is chapter 356 of the Laws of 1903 (Gen. Stat. 1909, §§ 4676-4683), the title of which reads as follows:

"An act requiring safeguards for the protection of all persons employed or laboring in manufacturing establishments, and providing civil remedies for all persons so engaged, or their personal representatives, in cases where any such person may be killed or injured while employed or laboring in any manufacturing establishment which is not properly provided with the safeguards required by this act."

Section 1 requires elevators, hoisting shafts and wellholes to be inclosed or secured. Section 2 provides that stairways shall be equipped with handrails, and shall be secured at sides and ends, that certain doors shall open outward, and that such doors shall be kept unfastened. Section 3 provides for fire escapes. Section 4 provides for the guarding of dangerous machinery and appliances. Sections 5 and 6 relate to remedy. Sections 7 and 8 are devoted to definitions of terms. The act relates to manufacturing establishments only, as defined in section 7, which reads as follows:

"Manufacturing establishments, as those words are used in this act, shall mean and include all smelters, oil refineries, cement works, mills of every kind, machine and repair shops, and, in addition to the foregoing, any other kind or character of manufacturing establishment, of any nature or description whatsoever, wherein any natural products or other articles or materals of any kind, in a raw or unfinished or incom-

plete state or condition, are converted into a new or improved or different form."

· The defendants claim they were not owning or operating a manufacturing establishment, and that the deceased was not employed or laboring in such an establishment when he was injured.

The defendants' business consists principally in buying and selling scrap iron, and converting it into shape so that mills can use it without further handling. They buy on the market iron of all grades, including railroad iron, old stoves, old waste iron and scrap iron of any description. Consignments come to them mostly by train from the surrounding country. The iron is unloaded at their yard and graded—that is, sorted out. Some of it they sell as it is—that is, it requires no cutting. Some of it must be cut to suit the requirements of purchasers, as appears from the following testimony of William Lewin, one of the defendants:

"Ques. Others you would cut up more for a matter of convenience in selling, would you, and handling? Ans. No, it would—we would have to cut it up according to specifications of the mill.

"Q. I say, whoever you were selling it to, you would sell it in whatever sizes they wanted it? A. Yes, we did that for their convenience.

"Q. You stated . . . that you cut up iron there according to the specifications of the mill? A. Yes, sir.

"Q. Will you just explain to us what you mean by that? A. Well, iron is graded in different grades. There is grade No. 1, and No. 2, and a grade called busheling scrap. Grade No. 2 must be cut all under eight inches. Grade No. 1 must be all over eight inches, and busheling scrap is this sheet iron, cut eight inches and under.

"Q. As I understand the situation, then, you got an order from the mill to cut certain lengths; that is what you were doing? A. Standing specifications.

"Q. Well, specifications from the mill? A. Yes, from the mill.

"Q. That is the person to whom you sold the iron? A. Well, not direct—yes, some of it was sold to the

mill direct, while others went through the hands of brokers.

"Q. Well, in any event, you were required, in order to sell it, to cut it to certain lengths? A. Not necessarily; we can sell it the way it is without cutting it.

"Q. I know, but you do cut it certain lengths? A. We did.

"Q. Cut it certain lengths to supply a demand for it? A. A good portion of it; yes."

The iron was cut by a machine called "alligator shears," equipped with a loose and a tight pulley. A line shaft, probably 100 feet long, was supported near the top of the building in which the shears were located. On this shaft was a pulley, and power was transmitted from the pulley on the shaft to the pulleys on the machine by a belt. Three pairs of shears, operated in this manner, were in use in the establishment.

It is not disputed that the iron, as it came into the yard and after it was sorted out, was a kind of material capable of being wrought into the form of a manufactured product, and so falls within the purview of section 7. The word "raw" is a relative term, and means simply not yet changed by some process of treatment or fabrication. The words "unfinished" and "incomplete" likewise refer to a state or condition not yet attained, and mean simply not fully fashioned to meet some design. Consequently, before passing through the shears the iron was in a raw, unfinished and incomplete state and condition, considered with reference to the needs and demands of the mill. By means of the shears the iron was converted into a new and different form. It lost its old, nondescript character, and acquired the new quality of uniformity in length. It was also converted into an improved form. It was changed from junk into milling iron of grade No. 1, grade No. 2, and busheling scrap. This conversion was accomplished by means of machinery especially designed for the purpose and not at all of a

rudimental type.    It was accomplished according to definite specifications and to meet a specific demand. It was accomplished in a fixed and settled place of business, equipped and maintained for the purpose, and when it was accomplished the iron in its new form became the completed and finished product of that establishment.

It is clear that every element of the statutory definition of a manufacturing establishment is present in the foregoing facts, unless it be otherwise from the following circumstances: Whoever acted as drafts-man for the legislature collocated the words of the act so that they say a manufacturing establishment includes a manufacturing establishment wherein the conversion described takes place. The defendants insist that, according to the language of the act, it is not enough that an establishment be one where raw materials are converted into new forms; that besides this such an establishment must be something more, namely, a manufacturing establishment; and that the meaning of the term "manufacturing establishment" must be sought for outside the act itself.

The only purpose of incorporating section 7 in the act was to preclude a roving quest for the meaning of words. The section was designed to make the meaning of the term "manufacturing establishment" as it had been used in the previous sections so clear that there could be no misunderstanding of just what establishments were included. In an effort to be explicit the draftsman violated the law of logic which forbids a definition to contain the name defined, and was guilty of the ancient fallacy, *"circulus in definiendo"*—"a circle in defining," whereby the definition ends where it started. But the intention is unmistakable, as a little scrutiny of the structure of the section will show. It first includes by name a number of establishments, some of which may not be popularly known or regarded as manufactories — smelters, oil refineries, cement

39—82 KAN.

works, mills of every kind, machine shops and repair shops. By force of the definition these all become manufacturing establishments. Then all other manufacturing establishments were included by the clause, "and in addition to the foregoing any other kind or character of manufacturing establishment of any nature or description whatsoever." Then, in order that the full scope of the act might not be mistaken, the broadest possible definition of a manufactory was added—"[a place] wherein any natural products or other articles or materials of any kind, in a raw or unfinished or incomplete state or condition, are converted into a new or improved or different form." Although somewhat elaborate in phraseology, in essence and in substance this is the universally inclusive definition of a manufactory which is found in the dictionaries, encyclopedias and works on economics.

The argument of the defendants may be met in another way. Since the legislature gave a section of the act to a definition of the term "manufacturing establishment," it may be assumed it did not intend to leave that term undefined. The introduction of the word "manufacturing" in the part of the section beginning "any other kind or character of manufacturing establishment" could add nothing, because, being the term to be defined, it could not make its own meaning manifest. If given any force it would make all that follows jargon. Consequently the word should be disregarded, and the statute should be read as follows: "And, in addition to the foregoing, any other kind or character of establishment of any nature or description whatsoever, wherein," etc.

The process of manufacturing may be very complicated or it may be simple in the extreme. There are primary and secondary stages, but the legislature has said that all establishments for the modification of natural objects to adapt them to human needs are embraced in the act. Very clearly that of the defendants

is included.  It is all the more easy to say this because it is apparent from the description given that the defendants operate what in all essential respects fulfills the popular notion of a mill for the production of a staple article. ' Besides this, the interpretation given the act serves to carry out the remedial and humanitarian purpose which 'it seeks to accomplish—the protection of working people from mutilation, physical deformity, physical pain, mental anguish and death, occasioned by the absence of practicable safeguards from the environment of their toil.

Section 4 and a portion of section 5 of the statute read as follow:

"SEC. 4.   Every person owning or operating any manufacturing establishment in which machinery is used shall furnish 'and supply for use therein belt shifters, or other safe mechanical contrivance, .for the purpose of throwing on or off belts or pulleys; and wherever it is practicable machinery shall be operated with loose pulleys.   All vats, pans, saws, planers, cog gearing, belting, shafting, set screws and machinery of every description used in a manufacturing establishment shall, where practicable, be properly and safely guarded, for the purpose of preventing or avoiding the death of or injury to the persons employed or laboring in any such establishment; and it is hereby made the duty of all persons owning or operating manufacturing establishments to provide and keep the same furnished with safeguards as herein specified."'   (Gen. Stat. 1909, § 4679.)

"SEC. 5.   If any person employed or laboring in any manufacturing establishment shall be killed or injured in any case wherein the absence of any of the safeguards or precautions required by the act shall directly contribute to such death or injury, the personal representatives of the person so killed, or the person himself, in case of injury only, may maintain an action against the person owning or operating such manufacturing establishment for the recovery of all proper damages." (Gen. Stat. 1909, § 4680.)

On the day of the casualty the decedent undertook to start the shears in obedience to an order from the fore-

man of the establishment to do so. No belt shifter or other mechanical device was provided for throwing the belt on the shaft pulley. This pulley was located some nine feet or more above the floor of the building. Sometimes the belt was thrown on with a stick. Sometimes a ladder was climbed and the belt was put on by hand. On this occasion the decedent used the ladder. The shaft terminated some two or three feet from the pulley, in a burred end, which was not boxed or otherwise guarded. The ladder broke, the shaft was revolving rapidly, the decedent's clothing became engaged with it, and he was killed. Besides being used for the purpose of putting on the belt, the ladder was employed to reach the shafting for the necessary purpose of oiling it. There was no dispute about any of these facts, except the distance of the shafting from the ground, which is not important. It was beyond the possibility of contact with men working at the shears. There was testimony that the ladder was used to oil the shafting and to put on the belt only when the machinery was not in motion. The court did not regard this testimony as material, under the circumstances, and instructed the jury to the effect that the plaintiff should recover if the provisions of the statute relating to belt shifters and safeguards were not observed and the absence of the required precautions caused or directly contributed to cause the injury. The defendants contend that the shafting was located where it was not dangerous to employees while engaged in the ordinary discharge of their duties, and that the employer is not required to guard against unusual or unexpected exposure to danger. The argument in support of this contention is that the statute was taken from New York, that at the time of its adoption here the New York statute had been construed according to the defendants' view, and that independently of its origin the statute does not contemplate liability for that which could not reasonably be foreseen.

Factory legislation is a matter of continuous growth and change. It began in England with the act passed in 1802 (42 Geo. III, ch. 73), which provided for the cleansing and ventilation of cotton mills and factories, and for the clothing, hours of labor and religious education of apprentices employed in such establishments. The factory and workshop act of 1901 (I Edw. VII, ch. 22) contains one hundred and sixty-three sections and embraces a great variety of subjects. The growth of this legislation is thus described in the introduction to the eleventh edition (1909) of Redgrave's Factory Acts:

"During the first three-quarters of the nineteenth century the course of legislation was from hand to mouth. Whenever new regulations were required, or defects appeared in old ones, or fresh classes of workers seemed to need protection, an act of parliament was passed *ad hoc*, with the result that in 1875 the law as to factories and workshops consisted of a perfect chaos of regulations contained in nineteen different statutes. In that year the whole subject was considered by a royal commission, whose report, published in 1876, led to the factory and workshop act, 1878, by which all the parts of the puzzle were fitted together in logical sequence, with such alterations as were deemed desirable.

"No sooner, however, had that act been passed than further extensions of the law were found necessary. Additional legislation took place in 1883, 1889, 1891, 1895 and 1897, which restored the old state of chaos and rendered it necessary to do the work of 1878 over again. This was done by the act of 1901, which (subject to the alterations which it in its turn has received, in 1903, 1906 and 1907) is, therefore, a complete code of the law relating to factories and workshops." (Page xxi.)

The experience of England has been paralleled in this country. A beginning in factory legislation was made by the Massachusetts act of April 16, 1836, "to provide for the better instruction of youth employed in manufacturing establishments." (See Laws Mass. 1842, ch. 60, § 1.) In 1897 the section of the New York law

which relates to the protection of employees operating machinery was imbedded in a labor code which covers thirty-nine pages of the statute book, and three more pages are filled with a schedule of laws repealed by the act. (Laws N. Y. 1897, ch. 415.) The chapter referred to has since been amended a number of times.

The first provision for safeguarding dangerous machinery was made by the legislature of Massachusetts in 1877, in an act which reads in part as follows:

"The belting, shafting, gearing and drums of all manufacturing establishments, when so located as to be, in the opinion of the inspectors hereinafter mentioned, dangerous to employees while engaged in their ordinary duties, shall be, as far as practicable, securely guarded." (Acts & Res. Mass. 1877, ch. 214, § 1.)

The subject of guarding vats and pans was introduced by an act of the Wisconsin legislature which took effect May 2, 1887, section 2 of which reads as follows:

"Every stationary vat, pan or other structure with molten metal or hot liquids shall be surrounded with proper safeguards for preventing accidents or injury to those employed at or near them. All belting, shafting, gearing, hoists, flywheels, elevators and drums of manufacturing establishments, so located as to be dangerous to employees when engaged in their ordinary duties, shall be securely guarded or fenced so as to be safe to persons employed in any such place or employment." (Laws Wis. 1887, ch. 549.)

Belt shifters or other mechanical contrivances for the purpose of throwing on or off belts or pulleys first appeared in the New York act of May 25, 1887, and such appliances were then required to be automatic. (Laws N. Y. 1887, ch. 462, § 11.) In 1890 this section of the law was amended in many particulars to read as follows:

"It shall be the duty of the owner of any manufacturing establishment, or his agents, superintendent, or other person in charge of the same, to furnish and supply or cause to be furnished and supplied therein, in the

Caspar v. Lewin.

discretion of the factory inspector, or of the assistant factory inspector, or of a deputy factory inspector unless disapproved by the factory inspector, where machinery is in use, belt shifters or other safe mechanical contrivances, for the purpose of throwing on or off belts or pulleys; and wherever possible machinery therein shall be provided with loose pulleys; all vats, pans, saws, planers, cogs, gearing and machinery of every description therein shall be properly guarded. Exhaust fans shall be provided for the purpose of carrying off dust from emery wheels and grindstones and dust-creating machinery therein. No person under eighteen years of age and no woman under twenty-one years of age shall be allowed to clean machinery therein while in motion." (Laws N. Y. 1890, ch. 398, § 12.)

In the labor law of 1897 (Laws N. Y. 1897, ch. 415) article 6 is devoted to factories, and besides the matter contained in section 81, which relates to the protection of employees operating machinery, includes regulations concerning the employment of minors, hours of labor of minors, the inclosure, operation and inspection of elevators and hoisting shafts, stairways and doors, fire escapes, the whitewashing or painting of walls and ceilings, the size of rooms and air space, ventilation, the reporting of accidents, washrooms and water-closets, time for meals, and the inspection of factory buildings. Besides prohibiting the removal or the rendering ineffectual of safeguards, except for repair, providing for exhaust fans to carry away dust, prohibiting the use of unguarded machinery on notice by the inspector, providing for lights in halls leading to workrooms, and prohibiting the cleaning of machinery in motion by males under eighteen and females under twenty-one, section 81 contains the following regulations material to this inquiry:

"The owner or person in charge of a factory where machinery is used shall provide, in the discretion of the factory inspector, belt shifters or other mechanical contrivances for the purpose of throwing on or off belts or

pulleys. Whenever practicable, all machinery shall be provided with loose pulleys. All vats, pans, saws, planers, cogs, gearing, belting, shafting, set screws and machinery, of every description, shall be properly guarded." (Laws N. Y. 1897, ch. 415.)

This act took effect June 1, 1897. It was amended in 1899 in some respects not now of consequence. (Laws N. Y. 1899, ch. 192, § 81.)

In March, 1897, a statute of the state of Indiana became effective which followed the New York law of 1890, and required mechanical substitutes for belt shifters to be "safe" and loose pulleys where "possible." (Laws Ind. 1897, ch. 65, § 8.) Mechanical contrivances for the purpose of throwing belts were required to be "safe" in Iowa (Laws Iowa, 1902, ch. 149, § 2), and in Minnesota (Laws Minn. 1893, ch. 7, § 21). In Pennsylvania "automatic shifters or other mechanical contrivances" were necessary. (Laws Pa. 1893, ch. 244, § 8.) In Ohio shifters for "shifting belts and poles and other appliances for removing and replacing belts on single pulleys" were sufficient. (Laws Ohio, 1900, p. 42, § 1.) In Connecticut (Acts Conn. 1887, ch. 152, § 3), New Jersey (Laws N. J. 1885, ch. 168, § 3) and West Virginia (Acts W. Va. 1901, ch. 19, § 1) machinery was required to be "securely guarded," instead of "properly guarded," as in Indiana, Iowa and New York. In Wisconsin the provision was "securely guarded or fenced." (Laws Wis. 1887, ch. 549, § 2.) In Massachusetts the expression was "securely guarded." (Laws 1887, ch. 214, § 1.) In Minnesota the phrase ran "properly guarded, fenced or otherwise protected." (Laws Minn. 1893, ch. 7, § 1.) In Missouri the words were "safely and securely." (Laws Mo. 1891, p. 160, § 3.) In Pennsylvania (Laws Pa. 1893, ch. 244, § 8) and Rhode Island (Laws R. I. 1894, ch. 1278, § 6) "proper safeguards" were required.

The protection of factory acts was expressly limited to employees engaged in their "ordinary duties" in the

states of Connecticut, Massachusetts, Missouri, New Jersey and West Virginia. This limitation did not appear in the laws of Indiana, Iowa, Minnesota, New York, Pennsylvania, Washington and Wisconsin. The original Wisconsin law has been quoted. In the revision of 1898 the limitations upon the classes of employees entitled to the protection of safeguards were "industriously by amendment dropped" (Marshall, J., in *Miller v. Kimberly & Clark Co.*, 137 Wis. 138, 143), and the law was made to read as follows:

"The owner or manager of every place where persons are employed to perform labor shall surround every stationary vat, pan or other vessel into which molten metal or hot liquids are poured or kept with proper safeguards for the protection of his employees, and all belting, shafting, gearing, hoists, flywheels, elevators and drums therein, which are so located as to be dangerous to employees in the discharge of their duty, shall be securely guarded or fenced." (Stat. Wis. 1898, § 1636*j*.)

In Ohio the owners and operators of all factories and workshops were required to make suitable provision "to prevent injury to persons who may come in contact with any such machinery." (Laws Ohio, 1900, p. 42, § 1). In Rhode Island belting and gearing were required to be provided with proper safeguards, and if vats, pans or structures filled with molten metal or hot liquid were not surrounded with proper safeguards "for preventing accident or injury to those employed at or near them" (Laws R. I. 1894, ch. 1278, § 9) the factory inspector might require alterations or additions.

The dangerous location of machinery was made a feature in Connecticut, Massachusetts, Minnesota, New Jersey, Missouri, Rhode Island and West Virginia; the practicability of guards in Connecticut, Massachusetts, Minnesota and New Jersey. In Missouri and West Virginia guards were required where possible.

Different methods were employed in different states to secure compliance with their factory acts. In New York violations of article 6 of the code of 1897 were made punishable as misdemeanors, with increasing penalties for repeated infractions. (Laws N. Y. 1897, ch. 416, § 384*l.*) No civil remedy was provided.

The statutes of all the states have not been compared, and all the differences of those which have been examined have not been noted. The foregoing, however, is sufficient to show the confused condition of the statute law of this country on the subject of protection to employees in factories when the legislature of this state approached the subject in 1903. It was not able, if it had been so inclined, to select an act, made to order, from the stock supplied by other states. It desired to cover a few matters in an effective way, but found no single statute and no single section of any statute which it could appropriate. Consequently it chose its own subjects, and framed its own regulations in its own way. Section 81 of the New York code (Laws N. Y. 1897, ch. 416; Laws N. Y. 1899, ch. 192) was too broad in its scope, too weak and indefinite in some of its requirements, and was unsuited for adoption because of the functions of the factory inspector. Its list of appliances was not accepted in its entirety. Substitutes for belt shifters were required to be safe. The items "cogs, gearing," were contracted into "cog gearing." Vats, etc., and machinery were required to be properly, that is, suitably, according to the nature of the appliance, and safely guarded, but this need be done only where practicable. The protection of the act was extended without limitation to "any person employed or laboring in any manufacturing establishment." It was made the duty of factory owners and operators not merely to provide the safeguards specified, but to keep their establishments furnished with them, and a right of

action was given in every case where the absence of the required safeguards caused or directly contributed to death or injury. From all this it is plain that the statute is unique, was so created by the legislature, and is not a transcript of the law of New York or of any other state. The result is it has not been given a settled and definite meaning by the highest court of New York, and the chief argument of the defendants may be laid aside.

Considered merely as a precedent, the New York case (decided in April, 1900) relied upon by the defendants was this: The plaintiff was employed to attend a machine known as a clinker crusher. Overhead some fifteen or eighteen feet was a revolving shaft, with a collar to prevent end thrust, from which projected a set screw. Under the shaft a platform was constructed for the purpose of affording access to a bearing immediately adjoining the set screw, which needed to be oiled. The platform was reached by means of a ladder. The plaintiff ascended the ladder to the platform to oil the bearing, the inevitable occurred, his sleeve caught in the set screw and he was seriously injured. After quoting the statute the court proceeded to emasculate it in the following way:

"The manifest purpose of the enactment was doubtless to give more force to the existing rule that masters should afford a reasonably safe place in which their servants are called upon to work. We think, however, that the legislature could not have intended that every piece of machinery in a large building should be covered or guarded. This would be impracticable. What evidently was intended was that those parts of the machinery which were dangerous to the servants whose duty required them to work in its immediate vicinity should be properly guarded, so as to minimize, as far as practicable, the dangers attending their labors. Human foresight is limited, and masters are not called upon to guard against every possible danger. They are required only to guard against such dangers as would occur to a reasonably prudent man as liable to happen. (*Cobb v. Welcher*, 75 Hun, 283.) In this case, as we have seen,

the shafting was located from fifteen to eighteen feet above the floor of the factory, and the collar containing the offending screw was at one end of the building, high above and out of the reach of the servants who were engaged in operating the machinery below. It could only be approached by a ladder, and the only necessity of approaching it at all was for the purpose of oiling the bearing under the shafting. It does not appear that any accident of this character had ever happened before at this bearing, or that it had ever occurred to any of the persons operating the factory that such an accident was possible or liable to occur. The statute does not attempt to specify how machinery shall be guarded otherwise than as 'properly guarded.' The necessity for the guard, and the character and description of the guard, must, of necessity, depend upon the situation, nature and dangerous character of the machinery, and in each case becomes a question of fact." (*Glens Falls P. C. Co. v. Travelers' Ins. Co.*, 162 N. Y. 399, 403.)

Taking up the argument of this opinion step by step, it may be observed that it proceeds upon precisely the same lines as if the statute did not exist. The practicability of safeguards for dangerous machinery does not depend upon the size of the factory or the number of pieces of machinery inside of it, but upon the nature of each machine. The question is, Is the machine or appliance of such a nature that it is practicable to deprive it of its homicidal attributes and not destroy its usefulness? If so it ought to be guarded, and all such pieces ought to be guarded, although a great many are assembled in one large building. The shaft bearing had to be oiled, just as the crusher had to be operated, and the ladder and platform were provided for the purpose of conducting the oiler to the necessary place. The oiler was obliged to do the work of oiling the bearing in the "immediate vicinity" of the set screw in the revolving shaft. The statute named set screws and shafting as appliances to be properly guarded, so as to minimize the danger attending the labor of the oiler while at work in their immediate vicinity. It did not require super-

human powers and would not have caused brain fag to foresee that a set screw projecting from a revolving shaft threatens danger to an employee obliged to work immediately adjoining them.  The legislature had that much prevision.  That body put set screws and shafting in the category of dangerous devices to be properly guarded when in proximity to places where labor must be performed, and thereby established the measure of prudence to be exercised.  The location of the shafting had nothing to do with the case.  It made no difference whether the shafting were brought down to the floor or the floor were taken up to the shafting by means of the ladder and the platform.  Of course the shafting was out of reach of persons operating machinery on the floor and having no business with it, but it was not out of reach of the oiler, who did have regular business with it.  Since it was imperative that the set screw in the shafting should be approached, it was immaterial whether it were approached on a platform reached by a ladder or on the floor level.  True, the only necessity for approaching the dangerous appliance was to oil the bearing, but that was a necessity just as much as attending to the crusher below, and whenever the operation was performed it was attended with danger.  It is indeed true that a human being must be mangled before it occurs to some factory owners that a set screw in a rapidly revolving shaft is dangerous to the person who must work near it, and that is the reason why the statute required it to be guarded.  There was no dispute about the situation, nature and dangerous character of the set screw.  No attempt was made to meet the peremptory terms of the statute and provide a guard for it.  That it was the plaintiff's duty to bring himself in proximity to it was not questioned.  Consequently there was nothing left but to declare that a statutory duty had been violated.  No reasons other than those considered having been stated in support of the decision, this court is unable to follow it.

The Glens Falls case was followed in 1905 by that of *Dillon v. National Coal Tar Co.*, 181 N. Y. 215. Shafting was located fourteen or fifteen feet above the factory floor. The foreman required a steam fitter to take down some pipe above the shaft while the machinery was running. The steam fitter worked on a ladder placed against the pipe. His jacket was caught by the shaft, he was whirled around, thrown to the floor, and severely injured. The court said:

"As the shaft which caused plaintiff's injuries was elevated fourteen or fifteen feet above the floor of the defendant's factory, and could be reached only by the use of a ladder, the defendant can not be charged with negligence under the factory act in failing to properly guard it. (*Glens Falls P. C. Co. v. Travelers' Ins. Co.*, 162 N. Y. 399.) The only ground upon which the defendant can be held liable, if at all, is that it failed in its duty to properly instruct the plaintiff before he was directed to take down the pipe upon which he was at work when injured. If the danger to be apprehended by coming in contact with the shaft was as open, obvious and apparent to the plaintiff as it was to the defendant, the latter was under no duty to instruct the former in this regard, for in that event the risk was one which he voluntarily assumed." (Page 219.)

With the utmost respect to the very learned court of appeals of New York, it is submitted that such rulings simply fritter away serious efforts on the part of the legislature to secure factory workers against the barbarities of an industrial system which has been conducted with amazing prodigality of human life and limb. It may be conceded that one way of preventing injury from shafting, set screws and other appliances is to locate them out of reach. But they are not out of reach whenever a workman's duty, in the course of his employment, takes him to them. Whenever such an occasion arises the statutory duty to interpose safeguards between the workman and danger arises. Dillon was obliged to work where unguarded shafting in motion would seize his clothing. The legislature had

his situation in mind when the statute was framed. The foreman had the choice of stopping the machinery or running the risk of inflicting a personal injury in violation of law. He chose the latter course, the result followed which the legislature had foreseen and had tried to circumvent, and the injured man ought to have recovered.

The court's views have been indicated far enough to show that it is not inclined to read into the statute any words which would limit its application to workmen engaged in ordinary duties only. The Missouri court of appeals says this must be done to make any factory act reasonable. (*Strode v. Columbia Box Co.*, 124 Mo. App. 511, 518.) The Missouri statute contains such a limitation, and, as pointed out above, the statutes of other states are careful to incorporate similar provisions. The legislature had these precedents before it when framing the law of this state and rejected them, thereby indicating its view of what is reasonable. The conduct of the Wisconsin legislature has been recited. Interpreting the amended statute the supreme court of that state said:

"It is beside the case to argue, as counsel for appellant do in their brief, that the shaft, at the point where the injury was received, was not so located as to be dangerous to appellant's employees 'in the discharge of their *ordinary* duties,' particular significance being given to the word 'ordinary.' If the employees, from the standpoint of the master, in the exercise of ordinary care were required in the course of their employment to go about or over the shaft, and so come in dangerous proximity thereto or contact therewith, whether the duty was ordinary or exceptional, the situation was within the statute. The law is cast in general terms. We can not interpolate into it the word 'ordinary,' and test appellant's conduct by a different standard than the legislature, in the proper execution of its police power, created. Such limitation upon the duty to guard as might be indicated by the word 'ordinary,' if it were in the statute modifying the word 'duty,' the legislature manifestly did not intend should

exist, from the fact that the word was industriously, by amendment, dropped from the law as it formerly existed; the words 'discharge of their duty' being substituted for 'engaged in their ordinary duties.'" (*Miller v. Kimberly & Clark Co.*, 137 Wis. 138, 142.)

This court has nothing to do with the policy of the factory act of this state, except to apprehend and give effect to it, or with the rigor of its requirements. Therefore it holds that it makes no difference whether the duty be ordinary and general or exceptional and occasional. If a person employed or laboring in a manufacturing establishment may, at the behest of duty, come in proximity to one of the appliances specified in the statute, it must be properly and safely guarded for the purpose of preventing or avoiding death or injury to him.

Common experience everywhere, registered in tables of gruesome statistics, affords fresh demonstration every day of the inadequacy of the common-law doctrine of reasonable care to provide places and instrumentalities reasonably safe against foreseeable occurrences to meet the situation of men, women and children who must manipulate, and must work in the midst of, the mechanical products of modern inventive genius. But when the legislature intervenes and makes the positive requirement that specific safeguards shall be maintained the statute is too often treated as a legal superfluity, and cases are decided according to the same old rules. So in this case the defendants want to try the question whether they should have reasonably anticipated that Caspar would be killed, notwithstanding the specific and positive command of the statute that a belt shifter or other safe mechanical contrivance for putting on the belt should be provided and that the shafting should be properly and safely guarded.

It is impossible for a factory owner or operator to foresee all the natural and probable results of his omissions. After an injury occurs he recognizes that his

failure to adopt some protective measure caused the injury. Therefore it is the law that if a reasonable man would have foreseen that injury in some form was likely to result, and injury does result, he is liable although the precise form of the injury was not foreseen. The factory act cuts squarely across the common-law doctrine of reasonable prudence and supplies that foresight in reference to the places, structures and appliances which it specifies. The legislature did not say, as in Connecticut and Massachusetts, that shafting so placed as, in the opinion of the factory inspector, to be dangerous to employees shall be guarded; or as in Wisconsin, that shafting so located as to be dangerous to employees shall be guarded. It said that all shafting used in a manufacturing establishment shall be guarded; and whenever a required safeguard or appliance has not been provided, the only question open to investigation is whether the injury occurred under circumstances which made the absence of it a contributing cause. In those instances in which practicability is a factor that matter may be tried, but to submit to a jury the question of prudence and foresight where the law has been ignored would be to reopen a subject which the legislature has closed by a final decision.

Section 1 of chapter 37 of the Laws of Washington, 1903, provides as follows:

"That any person, corporation or association, operating a factory, mill or workshop where machinery is used, shall provide and maintain in use proper belt shifters or other mechanical contrivances for the purpose of throwing on or off belts on pulleys."

Interpreting this statute the supreme court of that state said:

"The legislature has left little room in the premises for the exercise of discretion of mill operators, or of judgment on the part of juries. The statute was manifestly intended for the protection of life and to prevent

40—82 KAN.

the mangling of human bodies. To that end the legislature sought to make the protection as complete as such devices can make it. It did not say that belt shifters shall be maintained where necessary, and leave mill operators and juries to say when the necessity exists. The term 'proper belt shifters,' as used in the statutory connection, does not merely mean belt shifters in proper or necessary places, but rather *sufficient* 'belt shifters or other mechanical contrivances' to effect the 'throwing on or off belts on pulleys.' There is no classification of pulleys or places as to the matter of necessity or practicability; and it was the manifest theory of the lawmakers that, when belts have been placed upon any pulleys for the purpose of operating machinery, the necessity for removing and replacing them will at some time arise, and that, in order to guard against danger from an attempt to shift them while in operation, some effective contrivance must be maintained for that purpose.

"It certainly must be conceded that the contrivances must be maintained at all places where belts are shifted while in operation, in order to exempt the mill owner from the charge of negligence. The shifting of some belts while the machinery moves may seldom occur, but it is upon those rare occasions that the protection is needed. We are not now prepared to say that occasion may *never* arise when a question of this character may be proper for a jury, although it seems to us that, under this statute, such occasions must be very rare. To open the way for controversies as to whether the protection designated by the statute is or is not necessary or practicable in given places would lead to much litigation which might result in the nullification of the very purpose of the statute. Such statutes are mandatory, and it is not for the mill owners or juries to say whether the requirements are wise or necessary." (*Whelan v. Washington Lumber Co.*, 41 Wash. 153, 155.)

The protection of the act extends only to the persons employed or laboring in the factory—that is, acting within the scope of some employment or labor. The servant must be in a place which he may properly occupy, his conduct must be within the proper sphere of his duties, and the failure to supply a safeguard,

considered with reference to its purpose, must bear a true causal relation to the injury, although under the stringent provisions of the act it need not be the whole cause. The master may not, however, successfully evade the statute by attempting to narrow the scope of his servants' duty by rules or instructions. Thus, in this case, workmen were obliged to ascend the ladder to put the belt on the shaft pulley and to oil the shafting. The statute could not be nullified by an order to do this work only while the machinery was not in motion.

The court submitted to the jury the question of Caspar's contributory negligence, and the verdict acquitted him of fault. The defendants say that under the evidence he was culpably negligent as a matter of law. The plaintiff replies that contributory negligence is not a defense to an action founded upon the factory act. The question thus raised is one of interpretation. The statute is the very essence of simplicity, clear and emphatic in statement and absolutely free from ambiguity. "If any person employed or laboring in any manufacturing establishment shall be killed or injured in any case wherein the absence of any of the safeguards or precautions required by the act shall directly contribute to such death or injury" (Laws 1903, ch. 356, § 5; Gen. Stat. 1909, § 4680) an action lies.

It is the law in this state that when the language of a statute is plain and unambiguous there is no room left for a judicial interpretation which will change the effect of the language employed. (*Ayers v. Comm'rs of Trego Co.*, 37 Kan. 240.) This principle has been applied in some striking instances. Thus, in *Railway Co. v. Grain Co.*, 68 Kan. 585, the court refused to read into the statute of limitations an exception to meet the fraudulent concealment of a breach of contract, and in *McAllister v. Fair*, 72 Kan. 533, it refused to read into the statute of descents and distributions an exception which would disinherit a husband who feloniously

killed his intestate wife to acquire her property. The ground of these decisions is that the legislature makes the law and not the courts; that when language used in a statute is not in itself doubtful, and when given its ordinary significance does not admit of more than one meaning, that meaning governs; that it is not the province of the court to settle the domestic policies of the state; that it must administer the law regardless of individual cases of hardship; and that to engraft an exception upon a statute where the legislature has made none is judicial legislation. These principles are sound and apply with full vigor to the present statute.

The common law already gave a right of action to some employees under some circumstances. If the master failed to exercise reasonable care to provide reasonable safeguards and if the servant did not assume the risk and if he was not guilty of contributory negligence, then a liability existed. The sole purpose of the statute was to wipe out this narrow and conditional liability and substitute another. Words were duly chosen to that end which are insusceptible of misunderstanding. The word "any" is a term of indifference, and its repetition shows that it was used deliberately and emphatically—"any person," "any manufacturing establishment," "any case," "any safeguards or precautions." Consequently distinctions can not be made by interpolating qualifications and conditions, whether in respect to persons and cases or in respect to places and safeguards; and to declare that the act means no more than that "any person who at the time of injury, was himself in the exercise of due care" may maintain an action is to amend the law and not to interpret it. Furthermore, technical legal terms from the law of personal injuries are employed. The subject of contributing causes of the injury sued for is specifically treated. No exception to liability is made when the workman's negligence contributes to the injury. The legislature having chosen not to impose such

a condition upon recovery, the judiciary is powerless to do so.

The statute is a factory act and an employer's liability act combined. It bears internal evidence that the employer's liability acts of other states had been studied. They are usually drawn in favor of "an employee," and consequently are held to exclude employees of subcontractors. To meet this defect the protection of the act was extended not only to persons employed, but also to persons laboring, in a manufacturing establishment. The staple employer's liability act, however, expressly limits its application to "an employee, who at the time of the injury is in the exercise of due care." (Laws Colo. 1893, ch. 77; Acts Ind. 1893, ch. 130; Acts Mass. 1887, ch. 270; Laws N. Y. 1902, ch. 600.) The omission of any such restriction from the Kansas law appears to have been deliberate and intentional.

It may be said that the letter of a statute should not prevail over its sense and spirit, that a literal interpretation rewards carelessness, and that the act ought to be construed in connection with the settled maxims and principles of the common law. Precisely the same arguments were made in *McAllister v. Fair*, 72 Kan. 533, and were refuted in the opinion by the chief justice. But what is the spirit of this statute? It is to stop the insufferable waste of human life and limb which has been the universal accompaniment of the conduct of manufacturing industries. The law is a police regulation, adopted to reform the inhumanity of factory methods and to prevent the casting into the world of dependent cripples and widows and orphans left without means of support. This purpose includes the reduction of the number of casualties to the careless as well as to the prudent. If the prescribed precautions be taken and the required safeguards be installed, killing and maiming will cease, or at least will be reduced to a minimum.

In order that the factory owner may understand the

imperative character of the act it was necessary to provide some means of enforcing it. A criminal prosecution is a common method, but the legislature did not adopt it. Instead of this it provided a civil remedy in damages. The sanction was affixed for public purposes. In those cases in which want of care on the part of the employee contributes in some degree to his injury the public ends to be subserved would be defeated unless the negligent man were able to recover. Consequently the statute provides that an action may be maintained by any employee in any case in which the factory owner's neglect to obey the statute contributes to the injury.

In an action to recover the value of a cow killed by a railway company which had not fenced its track as the statute required Mr. Justice Cooley said:

"There still remains the question, however, whether the railway company could be held liable if the plaintiff himself was guilty of contributory negligence. Were this a common-law action it is clear that such contributory negligence would be a defense. [Citing cases.] But this is not a common-law action. It is an action given expressly by a statute, the purpose of which is not merely to compensate the owner of property destroyed for his loss, but to enforce against the railway company an obligation they owe to the public. The statute is a police regulation, adopted as much for the security of passengers as for the protection of property. [Citing cases.] And the decisions may almost be said to be uniform that in cases like the present, arising under such statutes, the mere negligence of the plaintiff in the care of his property can constitute no defense. [Citing cases.]" (*Flint & Pere Marquette R. R. Company v. Lull,* 28 Mich. 510, 515.)

Contributory negligence is not a defense to an action brought under the Kansas statute authorizing a recovery for stock killed in the operation of a railroad, where the right of way is not fenced. (*Railway Co. v. Paxton,* 75 Kan. 197.) The public policy to be promoted by fencing dangerous factory machinery is identical in

every respect with that which requires the fencing of railroad tracks.

It is fair to presume that the natural instincts of persons to avoid mutilation, pain and perhaps death will prevent any undue stimulation of carelessness through the influence of the statute, and the suggestion of such a result may be ignored along with the scarecrow arguments frequently advanced that litigation will be increased and capital driven from the state by effective factory acts. In any event these were matters for the legislature to weigh against the enormities of the former system, when adopting its policy.

The common law affords little aid to the interpretation of this statute, because, as already shown, it was intended to abrogate the common law and substitute a new and different duty, right and remedy.

"It is entirely clear, however, that where an absolute and specific duty to guard or fence dangerous machinery is imposed upon the master by statute, such new condition must, in a very material manner, affect the relations of the parties, and modify, to a considerable extent, their rights and duties as they existed at common law. And here a distinction is to be noted between statutes such as the employer's liability act (Acts 1893, p. 294, §§ 7083-7087, Burns, 1901), which provide in general terms that the employer shall be liable for injuries to an employee where the injury is occasioned by reason of defects in the condition of ways, works, plant, tools and machinery, etc., and statutes which require of the employer the performance of a specific duty, such as to guard or fence dangerous machinery. Statutes of the former class do little more than declare the rule of the common law. Statutes of the latter class impose specific obligations. A failure to comply with the requirements of the first may or may not be negligence. A violation of the second is an unlawful act or omission, a plain breach of a particular duty owing to the servant, and generally constitutes negligence *per se.*" (*Monteith v. Kokomo, etc., Co.,* 159 Ind. 149, 151.)

The common-law doctrines of reasonable care, assumption of risk, contributory negligence and coservice

took their rise at a time when shoes were made at the bench, the weaver had an apprentice or two, and the blacksmith a helper. Steam and electricity have revolutionized manufacturing industries so marvelously that no vestige of former conditions remains. But while the factory worker's environment has been completely changed his common-law rights and remedies have remained unchanged. It has been well understood for a long time that there is no juristic or economic excuse for this state of affairs. The liberty of capital to conduct its own business in its own way does not include the right to inflict the cruelties which have invariably characterized industrial progress. The liberty of the wage earner to contract for extra pay for extra hazard and to seek some other employment if he does not like his master's methods is a myth, or, as has been said, "a heartless mockery." (*Kilpatrick v. Grand Trunk Railway Co.*, 74 Ver. 288, 301.) The man and the machine at which he works should be recognized as substantially one piece of mechanism, and mishaps to either ought to be repaired and charged to the cost of maintenance. The courts can not abolish the old rules and adopt others which shall suit existing facts and remedy existing evils. That must be done by the legislature. But when tardy statutes are promulgated the courts should interpret them as favorably as their terms will allow, and not proceed to shackle them with the discredited common-law manacles. Sometimes it is held that quite radical factory acts make no change in the law. Sometimes it is declared that their most remedial features must be strictly construed because they penalize the factory owner. More often than otherwise it is held that the precious doctrine of assumption of risk can not be affected unless, like the king, it be expressly named. It is usually taken for granted that a legislature could not think of permitting a negligent factory worker to recover, although the farmer may collect damages from a railroad company for killing the cow or mule which he

negligently permits to run at large.  In a recent Indiana case the opinion reads:

"It is a matter of common knowledge that, owing to the spirit of invention and the demands of business, the use of powerful, swiftly moving and dangerous machinery in manufacturing establishments in this country has · been constantly growing at an ever-increasing rate for many years, and at the same time the casualty list from accidents resulting from the use of such machinery has been constantly swelling until at the date of the passage of this law it has reached alarming proportions.  Both the title of the act, which declares it to be 'An act concerning labor, and providing means for protecting the liberty, safety and health of laborers,' etc., and the provisions of the law, clearly show that this condition of affairs was in the legislative mind in the enactment of this law, and was an evil sought to be remedied thereby.  Its obvious purpose, among other things, was to reduce the hazard to those employed about dangerous machinery, to protect them from injury by accidental contact therewith, and it was evidently designed to protect the employee, not only from unavoidable accidents, but from his own negligent and careless acts which might result in his injury from accidental contact with such dangerous machinery. Not that the law gives to the employee a new right or remedy against his employer for such injuries, or in anywise relieves him from his common-law duty to exercise reasonable care to protect himself.  Its purpose is to prevent injury, not to give a right or remedy for its occurrence."  (*Evansville Hoop, etc., Co. v. Bailey,* 43 Ind. App. 153, 159.)

The Indiana statute makes a violation of its requirements a misdemeanor, punishable by fine for the first offense and by larger fines and by imprisonment for succeeding offenses.  (Acts Ind. 1899, ch. 142, § 25.) The Kansas statute depends for its enforcement upon the terror of suits for damages.  It may be wise or unwise, but it is so framed.  As the Indiana court perceived, the public humanitarian purpose is the same although the employee be negligent.  Therefore it may be

concluded that the Kansas statute did intend to confer a new right and a new remedy.

It is not necessary to pursue the subject further. The court holds that mere contributory negligence is not a defense to an action founded upon the factory act.

The foregoing conclusion is opposed to a statement made in *Madison v. Clippinger,* 74 Kan. 700, and repeated without examination or comment in some later cases. The question was not argued at all in the Madison case. Counsel conceded that contributory negligence was a defense, and the court was not called upon to examine the statute for the purpose of ascertaining the intention of the legislature in that regard. The opinion, however, cites *K. C. Ft. S. & G. Rld. Co. v. McHenry,* 24 Kan. 501, construing section 1 of chapter 93 of the Laws of 1870 (Gen. Stat. 1909, § 6998), which provides that railroads shall be liable for all damages done to persons or property in consequence of neglect on the part of the railroads. It was held that the act would be unconstitutional, as discriminating against railroads, if they were liable in every case of negligence, however slight, even though the plaintiff's negligence contributed equally, or more, to the injury. The statute considered, however, was not one providing for damages as a means of enforcing a positive duty enjoined by law in the interest of the public welfare. Statutes of the latter kind violate no principle of either the state or the federal constitution.

"The validity of this statute is challenged in an elaborate argument by defendant's counsel, because it excludes contributory negligence as a defense to an action brought for damages occasioned to a person or animal by want of a fence. It is doubtless true that the provision imposes an absolute liability in such a case. It certainly excludes the defense of contributory negligence where the corporation fails to perform the duty which the statute prescribes in the first instance. This is in the nature of a penalty for the neglect of the corporation to conform to a regulation which the legis-

lature seems to consider essential for the protection of life and property. We think there can be no doubt but such laws fall within the police power." (*Quacken-bush, Adm'x, etc., v. Wisconsin & Minnesota R. R. Co.,* 62 Wis. 411, 415.)

In *K. P. Rly. Co. v. Peavey,* 34 Kan. 472, 480, it was held, upon the admission of counsel, without independent examination or consideration by the court, that the act of 1874 (Laws 1874, ch. 93, § 1) making railroad companies liable to employees in certain cases did not disturb the rules of contributory negligence. That statute, however, was leveled solely at the fellow-servant rule, and bears slight resemblance in scope or purpose to the factory act. The first paragraph of the syllabus in *Madison v. Clippinger,* 74 Kan. 700, is overruled.

One other matter should be noticed, although the affirmance of the judgment of the district court does not depend upon it. Section 6 of the act makes it sufficient, in order to establish liability, for the plaintiff to prove in the first instance that death or injury resulted in consequence of failure to provide the required safeguards, or that failure to provide such safeguards directly contributed to such death or injury. The plaintiff showed that the shafting was unguarded and that as a direct result and consequence Caspar was killed. Under the statute the plaintiff was not required to go further and offer proof in the first instance that it was practicable to guard the shafting. The legislature was evidently moved by the fact that very often an injured employee is not competent to demonstrate the practicability of providing safeguards, and may not be able to command the expert evidence necessary to do so. The accident may have wrecked the machine, or the factory owner may remove it or deny him access to it. When the employee is killed, or witnesses are killed, the way to recovery is still further embarrassed. On the other hand, the factory owner always possesses the

ability to show that additions in the direction of safety would destroy the efficiency of the appliance causing the injury, or would otherwise be impracticable.

In *Henschell v. Railway Co.,* 78 Kan. 411, this section of the statute was not brought to the attention of the court and its purpose and effect were not considered. In that case the plaintiff proved that he was injured by a type of machine which required the manipulation of unguarded cogs. Therefore it was said that he was bound to extricate himself from the predicament in which his own evidence placed him, by showing how it was practicable to guard the cogs. Since the statute contemplates that ordinarily a plaintiff should not rest under such a burden the third paragraph of the syllabus of that case is overruled.

The judgment of the district court is affirmed.

MASON, J. (concurring specially) : I fully agree with the decision, and with the opinion, except as to the matter covered by paragraph 9 of the syllabus. The meaning there given to section 6 of the factory act makes a stronger and doubtless a better law, but I have difficulty in finding it in the language of the statute. Each of the first four sections prescribes some type of safety device. Section 6 says that the plaintiff need only prove in the first instance an injury resulting from a failure of the defendant to provide his establishment "with safeguards as required by this act." The term "safeguards" seems to refer to all the safety devices required by the act—not merely to those covered by section 4. The force of the provision, as applied to sections 1, 2 and 3, must be that while no recovery can be had unless certain facts exist—for instance, that the injury was received by an employee in the course of his duty—such facts are a matter of defense, and in the first instance the plaintiff need only show a violation of the act and a consequent injury. I think it means the same as applied to section 4, and that the plaintiff has the burden

Caspar v. Lewin.

of proving a violation of the law. The law requires a saw, for instance, to be guarded, in any case where that is practicable. Unless it is practicable there is no requirement. The safeguard required by the act is a guard where it is practicable. Until it is shown that a guard was practicable no violation is shown. Of course the plaintiff need not call expert machinists to testify on the subject. But it seems in harmony with the language of the act that he should give such a description of the machinery and its operation that the jury may be able to form an opinion on the question.

Section 3 requires at least one fire escape in manufacturing establishments three or more stories high. A plaintiff suing under that provision would have to show not only that there was no fire escape, but that the building had three stories. It further provides that as many more fire escapes shall be constructed as may be reasonably necessary. If one fire escape was provided and the plaintiff complained of the lack of another, I think he should have the burden of showing that another was reasonably necessary. So if he were injured by reason of a fast pulley, I think he should show that it was used in such a way that it would have been practicable to have substituted a loose pulley.

PORTER, J. (concurring specially) : I concur in the result and in holding that contributory negligence is not a defense in an action of this character. The only reasonable construction that can be given to the language of the act in my opinion is to hold that it enjoins a positive duty upon the employer, to which neither contributory negligence nor assumption of risk is a defense. I dissent, however, from that portion of the opinion and the corresponding portion of the syllabus which overrules the case of *Henschell v. Railway Co.,* 78 Kan. 411. I think that the words "with safeguards as required by this act" in section 6 have reference to all the safety devices required by the act, and not

merely to those mentioned in that section. No hardship or serious burden is imposed upon a plaintiff by requiring him to offer some evidence tending to show that his injury was caused by a failure of the defendant to comply with the provisions of the act.