Lisle Burnham, Trustee of the Bankrupt Estate of A. L. Adams, Appellee, v. Fort Dodge Grocery Company, Appellant.

**Bankruptcy:** preference: recovery by trustee. To constitute a preference within the meaning of the bankruptcy act it is essential that the creditor receiving the benefit shall have had reasonable cause to believe that the debtor intended thereby to give him a preference; it is not sufficient that he have reasonable cause to suspect insolvency. And the burden of establishing an unlawful preference is upon the trustee in bankruptcy seeking to receive the same.

**Same:** burden of proof. It is essential to a preference that the creditor receiving the payment participated in the desire of the debtor to effectuate a preference, but such purpose will be presumed if he knows or has reasonable grounds to believe a preference is intended; and a trustee in bankruptcy seeking to recover a preference has the burden on this issue.

**Same:** evidence. The debtor's embarrassing circumstances and the creditor's consequent anxiety to secure payment are not sufficient to show knowledge, or reasonable ground for believing the debtor insolvent. Evidence held insufficient to show a preference.

*Appeal from Webster District Court.*—Hon. C. G. Lee, Judge.

Monday, November 22, 1909.

THE facts are stated in the opinion. *Reversed.*

*B. J. Price,* for appellant.

*Kenyon, Kelleher & O'Conner,* for appellee.

WEAVER, J.—On February 23, 1907, certain creditors of A. L. Adams began proceedings to have him adjudged a bankrupt under the provisions of the Act of Congress, known as the "Bankruptcy Act" (Act July 1, 1898, chapter 541, 30 Stat. 544 [U. S. Comp. St. 1901, 3418]), and an order adjudging him a bankrupt was procured under date of June 11, 1907. For two and one-half years prior to December 10, 1906, Adams had been in business as the proprietor of a small grocery in Ft. Dodge. He was a man of small means, and for the purchase of his stock of about $1,800 in value he borrowed the greater part of the money from the Ft. Dodge National Bank. From the beginning he purchased the greater part of his supplies from the Ft. Dodge Grocery Company, a wholesale dealer in that city. His purchases were made at frequent intervals and in comparatively small amounts on the nominal terms of sixty days' credit, but he appears to have been granted considerable indulgence, and for much of the time he was indebted to the company in an amount varying from $400 to $800, on which he made frequent small payments. On December 10, 1906, when, as we shall hereinafter note, he sold out the business, he was owing the grocery company in the neighborhood of $850, and his indebtedness to the bank had been but slightly decreased. These two parties were his principal creditors, but he was owing quite a number of smaller bills, so that his aggregate liabilities of all kinds were somewhere from $2,800 to $3,100. Up to this date, so far as appears from the record, he had succeeded in maintaining a fair credit, and upon the surface at least there was no special reason

to believe him to be upon the verge of bankruptcy, though it was, of course, evident that his resources were quite limited. On or about the date named, December 10, 1906, Adams contracted to sell his stock to one Sulzbaugh at its invoice price, and on the following day, Sunday, an invoice was taken, showing an aggregate value of about $1,033. He had at that time accounts and claims due him the face value of which he estimated at $1,400, but their actual value was probably little more than nominal. While the invoice was in progress, Woodard, a representative of the grocery company, called at the store, learned of the projected sale, and had some talk with Adams about the payment of the debt to the company, obtaining his promise to make a payment from the proceeds of the sale. The transfer was consummated on the following day, and very soon after receiving his money therefrom Adams deposited it in the bank, and checked it out as follows: To the bank, $662.28; to the grocery company, $255.37, and to his landlord for rent, $53.50. There appears, also, to have been an outstanding check to the grocery company for $50.13 issued before the sale, but presented afterward and paid by the bank. Something more than two months later, as we have already seen, proceedings in involuntary bankruptcy were begun on the theory that these payments to the bank and grocery company were unlawful preferences made in contemplation of insolvency. The plaintiff, who is the duly appointed trustee in said proceedings, instituted this action entitling it in equity, alleging that a payment by way of unlawful preference was made to the defendant, and asking that the amount thereof be definitely ascertained, and that judgment therefor be had against defendant for the benefit of Adams' creditors. The answer denies the averments of the petition, and admits receiving payments from Adams at or about the time named in the petition to the amount of $305, but denies that the

same was received as a preference over other creditors or in contemplation of Adams' insolvency.

The merits of the case depend, of course, upon the answer to be given the question whether the payment under consideration constituted a preference within the meaning of the law. It is provided by the Bankruptcy Act (section 60b) that "if a bankrupt shall have given a preference within four months before the filing of the petition or after the filing of the petition and before the adjudication and the person receiving it or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee and he may recover the property or its value from such person." The effect of this statute and of similar prior statutes has been many times considered by this and other courts. So far as the general construction to be put upon an act of federal legislation is concerned, the Supreme Court of the United States is final authority, and to its holding with respect to this particular provision of the Bankruptcy Act we therefore turn. In *Grant v. Bank,* 97 U. S. 80 (24 L. Ed. 971), a creditor bank within four months prior to the filing of the petition had taken a trust deed from the debtor, and it was sought by the trustee in bankruptcy to set it aside as a preference in fraud of creditors. The trial court upheld the trustee's claim, but the Supreme Court reversed the decision in an opinion which discusses the statute as follows (the italics being those of the official report):

> Some confusion exists in the cases as to the meaning of the phrase 'having reasonable cause to believe such a person is insolvent.' *Dicta* are not wanting which assume that it has the same effect as if it had read 'having reasonable cause to *suspect* such a person is insolvent.' But the two phrases are distinct in meaning and effect. It is

*1. BANKRUPTCY: preference: recovery by trustee.*

not enough that the creditor has some reason to suspect the insolvency of his debtor, but he must have such a knowledge of the facts as to induce a reasonable belief of his debtor's insolvency in order to invalidate a security taken for his debt. To make mere suspicion a ground of nullity in such a case would render business transactions of the community altogether too insecure. It was never the intention of the framers of the Act to establish any such rule. A man may have ground of suspicion that his debtor is in failing circumstances, and yet have no cause for well-grounded belief of the fact. He may be unwilling to trust him further; he may feel anxious about his claim, and have a strong desire to secure it; and yet such a belief as the act requires may be wanting. Obtaining additional security or receiving payment under such circumstances is not prohibited by law. Receiving payment is put in the same category in the section referred to as receiving security. Hundreds of men continue to make payments up to the very eve of their failure, which it would be very unjust and disastrous to set aside; and yet this could be done in a large proportion of cases if mere grounds of suspicion of their insolvency were sufficient for the purpose. The debtor is often buoyed up by the hope of being able to get through with his difficulties long after his case is in fact desperate, and his creditors, if they know anything of his embarrassments, either participate in the same feeling, or at least are willing to think that there is a possibility of his succeeding. To overhaul and set aside all his transactions with his creditors made under such circumstances because there may exist some grounds of suspicion of his inability to carry himself through would make the bankruptcy law an engine of oppression and injustice. It would, in fact, have the effect of producing bankruptcy in many cases where otherwise it might be avoided. Hence, the act very wisely, as we think, instead of making a payment or security void for a mere suspicion of the debtor's insolvency, requires for that purpose that his creditor should have some reasonable cause to believe him insolvent. He must have knowledge of some fact or facts calculated to produce such a belief in the mind of an ordinarily prudent man.

This opinion was quoted and reaffirmed by the same

court in *Stucky v. Bank,* 108 U. S. 74 (2 Sup. Ct. 219, 27 L. Ed. 640), and has become a leading authority in cases of this nature. The doctrine has been recognized in many of our own cases. See *Rice v. Melendy,* 41 Iowa, 395; *Deland v. Bank,* 119 Iowa, 368; *Boudinot v. Hamann,* 117 Iowa, 22; *Bank v. Jewelry Co.,* 123 Iowa, 432; *Myers v. Fultz,* 124 Iowa, 437; *Doxsee v. Waddick,* 122 Iowa, 599. In the *Doxsee* case we held the creditors' suspicion or knowledge that the debtor contemplated closing out his business, and knowledge that he had sold all his book accounts, does not in itself disclose knowledge of the debtor's fraud or insolvency. The court there says: "A merchant is not necessarily insolvent because he goes out of business, nor is a merchant continuing in business necessarily insolvent or contemplating fraud when he sells his book accounts in a lump." In the *Myers* case the debtor having an old stock of goods which at one time invoiced nearly $1,800, but more or less depreciated in value, traded it for land worth about $800, and we held it not so inadequate or unreasonable as to necessarily manifest a fraudulent purpose.

It is also a well-settled rule that even though the insolvent debtor may be actuated by a fraudulent purpose or a desire to effectuate a preference, the creditor must participate in the purpose of defeating the Bankruptcy Act, though that purpose will, of course, be presumed if the creditor knows or has reasonable ground to believe a preference is intended. *Barbour v. Priest,* 103 U. S. 293 (26 L. Ed. 478); *Boudinot v. Hamann,* 117 Iowa, 22. In *Bank v. Jewelry Co., supra,* we held that the act of the creditor in taking security upon the property of its debtor who was then actually insolvent to secure a large claim was not necessarily fraudulent. Coming, then, to the case in hand, it may be conceded that at the time he sold out, and when he made his last payment to the grocery company, Adams

2. SAME: burden of proof.

was insolvent. Did the grocery company or its agent, Woodard, in receiving this payment, have reasonable ground to believe that in making the same Adams intended to effect a preference? The burden is upon the plaintiff to establish the affirmative of that proposition, and as he relies solely upon circumstantial evidence, his claim can not prevail if, when fairly considered, the proved circumstances are as consistent with the theory of good faith on the part of the defendant as they are with the theory of its bad faith or fraudulent purpose. A careful examination of the record leads us to the conclusion that such a case has not been made out. We shall not extend this opinion to discuss the testimony in detail. If Woodard (who for the purposes of this case may be treated as the grocery company) does not commit perjury, he did not understand or believe that Adams was at that time insolvent, or that this payment was made to give a preference.

That he may have suspected that Adams was in some degree embarrassed, and was therefore anxious to have his claim paid in whole or in part, may be apparent, but 3. Same: that he knew or had reasonable ground to evidence. believe him actually insolvent, and that by accepting the payment he was getting a preference in an insolvent's estate, is by no means established. Adams was apparently one of the many men of small means and small business ability who carry on a small business from year to year largely upon the faith which their business acquaintances and creditors have in their integrity, and upon the belief of creditors that, while having but little capital and often requiring extension of credits, they will not venture beyond their ability to pay out. That the defendant so regarded Adams is quite evident from the manner of its business with him, selling him goods at frequent intervals down to the time he closed out, and allowing him to pay in small sums at his convenience.

Moreover, the payment complained of being less than

one-third of Adams' debt gives rise to less unfavorable inferences than might be drawn had defendant then demanded and received payment in full with the knowledge that in so doing its debtor was left unable to pay other just demands against him. It is true that many of the facts shown are consistent with plaintiff's theory of an intended preference, but they are not inconsistent with the opposite conclusion, and for that reason will not sustain a recovery in this proceeding. *Reversed.*