Argued April 25, reversed and remanded June 18, 1918.

## CAMENZIND *v.* FREELAND FURNITURE CO.

(174 Pac. 139.)

**Master and Servant—Injuries to Servant—Failure to Guard Machinery—Burden of Proof.**

1.  In view of Laws of 1911, page 16, requiring employers to guard machinery, a servant injured by an unguarded machine has the burden of proving that it would have been practicable to have guarded it.

**Master and Servant—Injuries to Servant—Safe Place to Work.**

2. In the absence of a statute, the master is only required to employ reasonable care in providing a safe place to work, and, if by· due care and reasonable expense the employer can lessen the risk to the employee, it is his duty to do so.

**Master and Servant—Injuries to Servant—Failure to Guard Machinery—Burden of Proof.**

3. In determining whether the master has, as required by Laws of 1911, page 16, used every device and precaution which it is practicable to use for the safety of the servant, customary usage in the trade is not necessarily a conclusive test of the performance of the duty.

**Master and Servant—Injuries to Servant—Failure to Guard Machinery—Burden of Proof.**

4. Under such statute, the fact that others do not guard their machines does not of itself excuse any other employer from protecting his machine; nor does the fact that there are no guards on the market of itself relieve any employer from guarding against a danger.

**Master and Servant—Injuries to Servant—Failure to Guard Machinery—Evidence—Admissibility.**

5. In servant's actions for injuries due to absence of guard from machine, evidence that a certain guard is used in Switzerland is admissible to show that it was practicable and reasonably possible to guard the machinery, but not to show that the particular guard used in Switzerland should be used.

**Master and Servant — Injuries to Servant — Guarding Machinery — Duties of Master.**

6. If there are no guards on the market and none known to the employer, or if the guards on the market and those known to him are not reasonably suitable, he is nevertheless required to exercise the care, capacity and intelligence of a reasonably prudent and ordinarily intelligent person to suggest and fashion a reasonably suitable guard.

**Master and Servant — Injuries to Servant — Guarding Machinery — Duties of Master.**

7. The employer must guard a dangerous machine when it is practicable to do so, and he performs that duty when he uses such a guard as reasonably accomplishes the purpose.

[As to duty and liability of master with respect to guarding shafting, see note in Am. St. Rep. 1914A, 658. As to duty of employer to guard saws, see note in Ann. Cas. 1913C, 125.]

**Negligence — Workmen's Compensation Acts — Employers' Liability Acts—Construction.**

8. Workmen's Compensation Act (Laws 1913, p. 194), Section 15, providing that it shall be no defense for the employer to show that injury was caused in whole or in part by the negligence of a fellow-servant, or that the negligence of the injured workman, other than his willful act, contributed to the accident, cuts off the defense of contributory negligence, but does not preclude the employer from

pleading contributory negligence in reduction of recoverable damages as permitted by the Employers' Liability Act (Laws 1911, p. 16).

**Master and Servant—Employers' Liability Act—Character.**

9. The Employers' Liability Act is remedial in abolishing fellow-servant, contributory negligence and assumption of risk defenses, and preventive in requiring the master to take active steps to lessen the *possibility* of injury.

**Master and Servant—Employers' Liability Act—Duties of Master.**

10. The duties imposed on the master by the Employers' Liability Act are nondelegable, absolute and continuing.

**Master and Servant—Employers' Liability Act—Negligence Per Se.**

11. Transgression of the Employers' Liability Act by the employer is negligence *per se* and is actionable.

**Master and Servant—Employers' Liability Act—"Use."**

12. Laws of 1911, page 16, requiring the employer to use every safety device which is practicable, is satisfied only when the employer not only provides a guard but sees to it that it is used, since the word "use" means to make use of, to employ.

**Master and Servant—Employers' Liability Act—Use of Guards.**

13. Under Laws of 1911, page 16, requiring the master to use every practicable safety device, since the master's duty is continuous and nondelegable he must maintain the guards upon the machine unless the machine requires readjustment with each succeeding change of work.

**Master and Servant — Employers' Liability Act — Use of Guards — Duties of Master.**

14. Even where the work requires constant readjustment of a machine, it is the master's duty under Laws of 1911, page 16, to see that the guard is constantly kept on the machine when practicable, since if the employee fails to attach it he merely fails to do an act which it is not his duty, but the master's, to perform.

**Damages—Elements—Embarrassment.**

15. An injured servant cannot recover as an element of damages for any embarrassment that may result from his changed appearance due to the accident, such element of damages being too remote and indefinite.

From Multnomah: ROBERT G. MORROW, Judge.

Department 1.

The plaintiff Frank Camenzind suffered the loss of two fingers while working for the Freeland Furniture Company, a corporation, on a machine known as a double spindle shaper. Camenzind sued the company

and obtained a judgment for damages; and the defendant appealed.

A double spindle shaper is used in shaping table legs and other parts for furniture. The machine rests upon the floor and is about three and one-half feet in height. The top consists of a table through which there are two holes to and through each of which a perpendicular shaft extends from underneath the table. A spindle is attached to the end of each shaft. Knives are set in each spindle and are kept in position by being placed between two disks which are drawn tightly together by means of a nut. The cutting edge of each knife extends beyond the rim of the disks. The knives in the shaper are operated on the same principle as an ordinary planing-machine with this difference: the spindle on a shaper revolves on a vertical axis while the spindle on a planer turns on a horizontal axis.

The spindles are, of course, above the surface of the table and are about two feet apart. When the machine is being operated the spindles make between four and five thousand revolutions per minute. The operator must apply the wood, upon which he is working, to the rapidly revolving knives so that they will cut with and not against the grain in the wood, and in order to enable him easily to do this the right-hand spindle revolves to the left while the left-hand spindle turns to the right so that he can use one or the other spindle upon the work in hand. There are different models for table legs and other parts of furniture shaped on the machine. There is a frame for nearly every different model and consequently there are practically as many frames as there are models. The spindle is so arranged that it may be raised or lowered. Different patterns or models require different

89 Or.—11

knives and for that reason each machine is supplied with a variety of knives. When the work is changed from one to another model it is usually necessary for the operator to adjust the spindle by raising or lowering it so as to accommodate it to the stick to be shaped and also to remove the knives from the spindle and to replace them with other knives suited to the new model. The operator may find it necessary to readjust the spindle and knives many times during the course of a single day, and sometimes as often as nine and ten times in an hour.

A stick of wood is first sized on the band-saw and is then taken to the shaper. The operator of the shaper places the stick of wood in the proper frame, shoves the frame containing the stick along the surface of the table until the stick comes in contact with the knives and holds the stick against the knives until all that part of the stick which overhangs the frame is pared off. The spindle has a collar just below the knives and when the overhang of the stick is pared off the frame comes in contact with this collar preventing the knives from cutting any more off the stick with the result that the stick upon which the operator has worked takes the same shape as the side of the frame holding the stick. Sometimes a stick has a snarl or curl in it with the grain of the wood running in one way on one side of the snarl and in the opposite way on the other side of the snarl. When working on a cross-grained stick the operator must commence on the snarl or rough place and in doing this there is always danger of deviating from the center of the snarl and causing the knives to cut against instead of with the grain, and if a knife happens to cut against the grain it will "grab" and "jerk" the stick and probably throw one of the hands of the operator against a spindle.

If the shaft bearings beneath the table become worn and loose the shaft and consequently the spindle will rotate on a vacillating axis and wabble and thus increase the danger of the knives grabbing the stick and hence aggravate the risk incurred by the operator.

The plaintiff worked as a band-saw and shaper-machine man for the defendant from January, 1916, until April 7, 1916, when he was injured while operating the shaper. The plaintiff had shaped 170 sticks on the day of the accident and had 30 more sticks of the same model to shape. He placed a cross-grained stick in the frame and when he commenced to work on the rough place or snarl in the stick the knives cut against the grain, "grabbed" the stick and threw plaintiff's left hand against one of the spindles, causing the loss of two fingers.

The complaint alleges that the shaft bearings of one of the spindles became worn and loose and caused the spindle to wabble and that although the plaintiff notified the defendant of the defect the latter failed to make the necessary repairs and that because of this wabbling a knife in one of the spindles,

"became caught in a piece of wood with which the plaintiff was working, in a more unusual, uncommon and greater extent that it would have if said machine had been in proper repair, which caused plaintiff's left hand to be suddenly drawn in and against the spindle"; and "said injury was also occasioned by the carelessness, negligence and omissions of the defendant in failing to provide said shaper-machine with * * a shaper-guard, which would render it impossible for such injury as plaintiff received to occur."

The defendant answered by denying that the machine was in a defective condition or that the company had failed to provide a shaper-guard; and for affirmative defenses the defendant alleged: (1) that the in-

jury was caused by the sole negligence of the defendant; and (2) that the plaintiff assumed the risk. The defense of sole negligence is predicated upon the theory that

"the plaintiff negligently placed his hands in an improper and dangerous position while sawing the said piece of wood in that he grasped the said wood with his hands on the side of the said piece closest to the knives of the said machine" instead of holding "said wood with his hands on the side thereof closest to himself and away from said knives."

The attempted defense of assumption of risk is introduced by an allegation that the machine was in proper order and also provided with all such devices and guards as were practicable to use in the operation of the shaping machine; and then follows an allegation that

"the ordinary risks of operating the said machine *in the said condition* were open and obvious, known to the said plaintiff and appreciated by him,"

and that the plaintiff assumed whatever risk was incurred in the operation of the machine.

                                    Reversed and Remanded.

For appellant there was a brief over the names of *Mr. Bert W. Henry* and *Messrs. Griffith, Leiter & Allen,* with an oral argument by *Mr. Harrison Allen.*

For respondent there was a brief over the names of *Mr. G. E. Hamaker* and *Mr. Albert Streiff.*

HARRIS, J.—The complaint was framed and the cause was tried by the plaintiff on the theory that the defendant had failed to guard the machine as required by Chapter 3, Laws of 1911, which is commonly known as the Employers' Liability Act and was enacted in 1910

by the people in the exercise of the initiative.   Section 1 of the act reads as follows:

"All owners, contractors, subcontractors, corporations or persons whatsoever, engaged in the construction, repairing, alteration, removal or painting of any building, bridge, viaduct, or other structure, or in the erection or operation of any machinery, or in the manufacture, transmission and use of electricity, or in the manufacture or use of any dangerous appliance or substance, shall see that all metal, wood, rope, glass, rubber, gutta percha, or other material whatever, shall be carefully selected and inspected and tested so as to detect any defects, and all scaffolding, staging, false work or other temporary structure shall be constructed to bear four times the maximum weight to be sustained by said structure, and such structure shall not at any time be overloaded or overcrowded; and all scaffolding, staging or other structure more than twenty feet from the ground or floor shall be secured from swaying and provided with a strong and efficient safety rail or other contrivance, so as to prevent any person from falling therefrom, and all dangerous machinery shall be securely covered and protected to the fullest extent that the proper operation of the machinery permits, and all shafts, wells, floor opening~ similar places of danger shall be inclosed, and a. chinery other than that operated by hand power ꜱꜲall, whenever necessary for the safety of persons employed in or about the same or for the safety of the general public, be provided with a system of communication by means of signals, so that at all times there may be prompt and efficient communication between the employees or other persons and the operator of the motive power, and in the transmission and use of electricity of a dangerous voltage full and complete insulation shall be provided at all points where the public or the employees of the owner, contractor or subcontractor transmitting or using said electricity are liable to come in contact with the wire, and dead wires shall not be mingled with live wires, nor strung upon the same support, and the arms or supports

bearing live wires shall be especially designated by a color or other designation which is instantly apparent and live electrical wires carrying a dangerous voltage, shall be strung at such distance from the poles or supports as to permit repairmen to freely engage in their work without danger or shock; and generally, all owners, contractors or subcontractors and other persons having charge of, or responsible for, any work involving a risk or danger to the employees or to the public, shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices.''

By the remaining sections the foreman or other person in charge of the work is made the agent of the employer and a penalty is prescribed for a failure to comply with the requirements of the act. The statute abolishes the defense of negligence of a fellow-servant and precludes the employer from pleading contributory negligence as a bar, although he may plead it for the purpose of enabling the jury to take it into account in fixing the amount of the damages. The courts and the profession have experienced not a little difficulty in construing and applying some phases of the statute and the judicial construction placed upon those phases has been to a certain degree the result of a process of evolution. While much of Section 1 has no application to the instant case it may nevertheless help to ascertain the full extent and meaning of such parts of the section as may be applicable here and thus aid in the determination of the questions presented by this appeal if the whole of the section is set down in the form of an outline as follows:

11 AND ALL

scaffolding, staging, false work or other temporary structure 12 { shall be constructed to bear four times the maximum weight to be sustained by said structure, and 13 { such structure shall not at any time be overloaded or overcrowded; 14

scaffolding, staging or other-structure 15 { more than 20 feet from the ground or floor 16 { shall be secured from swaying and 17 { provided with a strong and efficient safety rail or other contrivance, 18 { to the fullest extent that the proper operation of the machinery permits, 22 { so as to prevent any person from falling therefrom, 19

dangerous machinery shall be securely 20 { covered and protected 21

shafts, wells, floor openings and similar places of danger 23 { shall be enclosed, 24

machinery other than that operated by hand power shall, whenever necessary 25 { for the safety of persons employed in or about the same or for the safety of the general public, 26 { be provided with a system of communication by means of signals, 27 { so that at all times there may be prompt and efficient communication between the employes or other persons and the operator of the motive power, 28

29 AND IN THE TRANSMISSION AND USE OF ELECTRICITY OF A DANGEROUS VOLTAGE

30 full and complete insulation shall be provided at all points where

31 the public or the employes of the owner, contractor or subcontractor

32 transmitting or using said electricity

33 are liable to come in contact with the wire, and

34 dead wires shall not be mingled with live wires, nor strung upon the same support, and

35 the arms or supports bearing live wires shall be especially designated by a color or other designation which is instantly apparent and

36 live electrical wires carrying a dangerous voltage shall be strung at such distance from the poles or supports as to permit repairmen to freely engage in their work without danger of shock;

Turning to 20 in the outline it may be observed that all "dangerous machinery shall be securely covered and protected to the fullest extent that the proper operation of the machinery permits." It may be assumed, without deciding, that this clause refers more especially to revolving shafts having beveled gearing or protruding nuts or exposed bolt-heads, and to cog-wheels and the like. It is manifest, however, that all that part of the section which follows the words "and generally" is applicable to the instant case. If the work involves a risk or danger to the employee the employer must use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity of preserving the efficiency of the machine.

1. The complaint alleges that the defendant failed to use every device which it was practicable to use and that when fully equipped the machine has a safety-guard attached to it which does not in any manner interfere with the efficiency of the machine. The defendant denied this allegation and hence the pleadings raised an issue which required evidence. In some states the burden is upon the employer to show that a guard is impracticable: *Reddington* v. *Blue & Raferty,* 168 Iowa, 34 (149 N. W. 933); *Gross* v. *Eagle Wheel Mfg. Co.,* 252 Pa. 361 (97 Atl. 457); *Caspar* v. *Lewin,* 82 Kan. 604, 635 (109 Pac. 657, 49 L. R. A. (N. S.) 526); but in this jurisdiction the burden is upon the plaintiff to show that it was practicable to guard the machine: *Cameron* v. *Pacific Lime & Gypsum Co.,* 73 Or. 510, 517 (144 Pac. 446, Ann. Cas. 1916E, 769).

Previous to 1913, when he came to Oregon, the plaintiff had worked for about fifteen years on shaper-machines in Switzerland. He made and was permitted to introduce in evidence a wooden model of a guard

that he had used in Switzerland.  The defendant contends that it was error to permit Camenzind to testify that guards like Exhibit "F," the wooden model, were used in Switzerland and that it was also error to receive Exhibit "F" in evidence.  It was not shown that Exhibit "F" had been in general use in Oregon or that the defendant had actual knowledge of the existence of such a guard.  A deputy labor commissioner and factory inspector of Oregon testified, however, that "in one instance" he had seen "a guard of that nature" prior to April, 1916.  The argument of the defendant is that

"evidence of practicability of any safety device must be confined to comparisons with other devices in use under similar circumstances and in local areas"; and that "to determine whether or not the device suggested for use is practicable or feasible, it must be shown to be in common use in the vicinity where defendant's machine is being operated or to be in general use on machines of the kind under observation."

2–5.  In the absence of a statute the master is only required to employ reasonable care in providing a safe place to work and if by due care and reasonable expense the employer can lessen the risk to the employee it is his duty to do so: *Duntley* v. *Inman,* 42 Or. 334, 343 (70 Pac. 529, 59 L. R. A. 785) ; *Westman* v. *Wind River Lumber Co.,* 50 Or. 137, 140 (91 Pac. 478).  In some states the courts hold, as a matter of law, that the employer does his full duty if he uses such machinery and safety appliances as are in general use, while in other jurisdictions usage is not conclusive but is only to be considered in connection with other evidence: *Adams* v. *Corvallis & E. R. Co.,* 78 Or. 117, 128 (152 Pac. 504) ; 3 Labatt on Master and Servant (2 ed.), §§ 940 and 947.  Whether usage is accepted

as a conclusive test or received merely as evidence of due care it is accepted as a test on the one hand and is received as evidence on the other hand on the theory that employers generally exercise reasonable care and that therefore whatever appliances employers may generally use are such as a reasonably prudent person would use.   The statute, however, has enlarged the duty of the master and instead of being satisfied with the exercise of reasonable care the law now requires the master to use every device, care and precaution which it is practicable to use for the safety of the servant: *Nordin* v. *Lovegren Lumber Co.,* 80 Or. 140, 147 (156 Pac. 587) ; see also: *Caspar* v. *Lewin,* 82 Kan. 604, 635 (109 Pac. 657, 49 L. R. A. (N. S.) 526). Since the duty of the master has been enlarged it necessarily follows that usage is not necessarily a conclusive test of the performance of that duty.   It may or it may not be the custom of employers to obey the statute and yet no one of them can be excused from obeying the statute even though every one of them has disobeyed its mandate: 3 Labatt on Master and Servant (2 ed.), § 944; *Reddington* v. *Blue & Raferty,* 168 Iowa, 34 (149 N. W. 933) ; *Callopy* v. *Atwood,* 105 Minn. 80 (117 N. W. 238, 18 L. R. A. (N. S.) 593) ; 5 Labatt on Master and Servant (2 ed.), 5663.   The contention of the defendant, if adopted, would in effect nullify the Employers' Liability Act.   The argument of the defendant even goes to the extent of making usage the sole test of practicability.   The application of this sort of a test would relieve an employer from guarding a machine if no other employer guarded the same kind of a machine under like conditions.   The fact that others do not guard their machines does not of itself excuse any other employer from protecting his machine; nor does the fact that there are no guards on

the market of itself relieve any employer from guarding against a danger. There are two principal questions to be answered: Does the machine involve risk or danger? and, Is it practicable to guard the danger and at the same time preserve the efficiency of the machine? It is conceded that the shaper involves a risk or danger and therefore comes within the embrace of the statute; but since the answer denies that it is practicable to guard the machine it was competent for the plaintiff to offer evidence concerning Exhibit "F." Evidence relating to the guard used in Switzerland was competent, not for the purpose of showing that the defendant should have used that particular guard, but to show that it was practicable and reasonably possible to guard the spindle: *Cameron* v. *Pacific Lime & Gypsum Co.*, 73 Or. 510, 518 (144 Pac. 446, Ann. Cas. 1916E, 769).

6, 7. The defendant insists that to admit evidence of Exhibit "F" is equivalent to saying that an Oregon employer is liable for failure to have a guard on his machine even though there be no known guard in all the world except in Switzerland where some inventive genius has contrived one which is only known to him or to the workmen employed there.

The Employers' Liability Act neither contemplates nor requires that employers shall possess a genius for invention, but, as was said in *Barclay* v. *Puget Sound Lumber Co.*, 48 Wash. 241 (93 Pac. 430, 16 L. R. A. (N. S.) 140, 145), "they must not stand back and await the suggestion of remedies, when the exercise of reasonable prudence and care on their part will suggest them." The employer must guard a dangerous machine when it is practicable to do so and he performs that duty when he uses such a guard as reasonably accomplishes the purpose: *Burroughs* v. *Cur-*

*tiss Lumber Co.,* 58 Or. 270, 275 (114 Pac. 103);
*Stephenson* v. *Sheffield Brick & Tile Co.,* 151 Iowa, 371
(130 N. W. 586); *Kirchoff* v. *Hohnsbehn Creamery
Supply Co.,* 148 Iowa, 508 (123 N. W. 220); *Redding-
ton* v. *Blue & Raferty,* 168 Iowa, 34 (149 N. W. 933);
*Wagner* v. *Standard Sanitary Mfg. Co.,* 244 Pa. 310
(91 Atl. 353); *Gross* v. *Eagle Wheel Mfg. Co.,* 252 Pa.
361 (97 Atl. 457). The statute does not penalize a
want of genius by imposing a penalty, nor does it re-
ward a want of common prudence and intelligence by
excusing culpability. The law does not expect all men
to be geniuses, nor does it expect all men to be dullards.
If there are no guards on the market and none known
to the employer or if the guards on the market and
those known to him are not reasonably suitable he is
nevertheless required to exercise the care, capacity
and intelligence of a reasonably prudent and ordi-
narily intelligent person to suggest and fashion a rea-
sonably suitable guard; and in this connection it may
be added that Exhibit "F" was competent evidence
to submit to the jury for their consideration in deter-
mining whether the defendant was liable in damages
for not having used a guard on the shaper. It is true
that the defendant claims that it used a guard. The
plaintiff, however, took the position that a guard was
never furnished; and hence he was entitled to offer
evidence for the purpose of proving the elements es-
sential to his theory of the case.

8. The plaintiff contends that there was only one
question properly to be submitted to the jury. This
contention arises out of the fact that the defendant
elected not to accept the benefits of the Workmen's
Compensation Act and is predicated on the theory that
this statute precludes an employer, who would come
within its embrace unless he has formally elected not to

accept its benefits, from pleading the negligence of the employee either as a bar or for the purpose of reducing the amount of damages recoverable from the employer. In brief, the position of the plaintiff is that Camenzind is entitled to recover even though he was negligent and the Freeland Furniture Company was not negligent, unless the injury was caused by his willful act committed for the purpose of sustaining the injury. Section 15 of Chapter 112, Laws of 1913, commonly known as the Workmen's Compensation Act, provides that in any action for personal injury brought against any employer engaged in any of the occupations specified by the statute

"it shall be no defense for such employer to show that such injury was caused in whole or in part by the negligence of a fellow-servant of the injured workman, that the negligence of the injured workman, other than in his willful act, committed for the purpose of sustaining the injury, contributed to the accident, or that the injured workman had knowledge of the danger or assumed the risk which resulted in his injury."

If we again look at Section 15 and quote only such part of it as is applicable to the subject under discussion it will be seen that it will read thus:

"It shall be no defense for such employer to show * * that the negligence of the injured workman contributed to the accident * * ."

The title of the act speaks of "abolishing in certain cases the defenses of assumption of risk, contributory negligence and the negligence of a fellow servant in actions for personal injury and death." It will be noticed that the words "in whole or in part" are used in connection with "the negligence of a fellow-servant"; but neither the words "in whole or in part" nor any equivalent language is used in con-

nection with "the negligence of the injured workman." Manifestly, the Workmen's Compensation Act does no more than to abolish the *defense* of contributory negligence and no appropriate language is used to indicate an intention to preclude the employer from pleading contributory negligence in reduction of recoverable damages as permitted by the Employers' Liability Act. Most of the precedents cited by the plaintiff relate to claims for compensation made pursuant to a Workmen's Compensation Act by employees entitled to receive the benefits provided for by it, while the remaining cases relied upon by the plaintiff discuss statutes containing language unlike ours.

The court refused to instruct the jury that the company performed the duty imposed upon it by the Employers' Liability Act if it furnished guards and left them where they could have been used by the plaintiff; but the court told the jury that

"it is the duty of the master to put the safety device on the machine and to see that it is kept there at all times except when the work requires that it shall be removed."

The position taken by the defendant can be better understood if attention is first directed to some facts not already related. In January, 1916, Camenzind presented himself to the defendant's superintendent and asked for employment, stating that he was a bandsaw and shaper-machine man with 15 years' experience. The superintendent testified as follows:

"I said, 'Do you understand operating and taking care of the machines, and filing your band-saws and brazing them and adjusting them?' And he said he had had fifteen years' experience in the old country, and was capable of going ahead and doing the work, and consequently I put him to work"; and "I took him

89 Or.—12

in the factory and showed him the band-saw and shaper and patterns and headers, and everything belonging to the machine; even the knives and wrenches, and everything that went with the machine."

Twenty-five or thirty frames, knives and caskets containing knives for the shaper-machine were hanging on a wall immediately in front of and six or eight feet from the machine. Witnesses for the defendant stated that two guards, like the guard offered in evidence by the defendant and marked Exhibit "X," came with the machine and that when the shaper was installed more than a year prior to the accident the two guards were either hanging on the wall where the frames and knives were kept or they were laid upon the floor and against the wall. There was evidence to the effect that the guards had been used on the machine prior to January, 1916. There is no evidence tending to show that the guards were attached to the machine when Camenzind went to work; and there is no evidence from which it can be inferred that Camenzind used the guards at any time during the period of his employment. Witnesses for the defendant declared that the guards which had come with the machine were either hanging on the wall or were upon the floor and against the wall when Camenzind was injured. Camenzind testified that there were no guards on the machine in January when he commenced to work; and that he never at any time saw the guards or knew of their existence. Moreover, the superintendent admitted that on one occasion he observed the plaintiff performing his work in what he considered was a careless way and that the plaintiff was working without a guard, and yet the superintendent does not

say that he directed or even suggested that Camenzind make use of the guards.

It is conceded that Exhibit "X" is a suitable guard and the plaintiff admitted that if it had been on the machine he would not have been injured. The plaintiff says that the defendant did not even furnish guards like Exhibit "X," while the defendant insists that it did. The company either did or it did not furnish the guards; if it did not furnish them at all then on its own theory of the law the defendant is liable. But if the company did furnish guards and they were where it claims they were then a situation is presented where the defendant contends that it did and the plaintiff insists that it did not perform its full duty. The argument of the defendant is that the very work in which the plaintiff was engaged made it necessary for the plaintiff, as a part of that work, to remove and replace the guards, for it must be remembered that whenever the work changed from one to another model it was necessary to change knives and to raise or lower the spindle so as to accommodate the machine to the changed model. There is testimony, too, that a guard cannot be used at all when the employee is working on some models. It is conceded, however, that it was practicable to have used a guard on the work in which the plaintiff was engaged when injured.

9. It must at all times be kept in mind that the Employers' Liability Act is both remedial and preventive in character. To the extent that the statute abolishes the defenses of common employment, contributory negligence and assumption of risk it is purely remedial; and to the extent that it imposes upon the master the duty of taking active steps to lessen the possibility of injury or death to the employee it involves the additional element of prevention; and it may also

be observed that as stated in *Browning* v. *Smiley-Lampert Lumber Co.*, 68 Or. 502, 512 (137 Pac. 777), our statute seems to be broader in its scope than kindred statutes found in other states. The outstanding purpose of the statute is to protect employees from injury and the statute should be liberally construed to effect that purpose: *Schaedler* v. *Columbia Contract Co.*, 67 Or. 412, 416 (135 Pac. 536); *Wasiljeff* v. *Hawley Paper Co.*, 68 Or. 487, 498 (137 Pac. 755); *McFarland* v. *Oregon Electric R. Co.*, 70 Or. 27, 33 (138 Pac. 458, Ann. Cas. 1916B, 527); *Blair* v. *Western Cedar Co.*, 75 Or. 276, 281 (146 Pac. 480); *Dickerson* v. *Eastern & Western Lumber Co.*, 79 Or. 281, 288 (155 Pac. 175); *Clayton* v. *Enterprise Electric Co.*, 82 Or. 149, 156 (161 Pac. 411); 5 Labatt on Master and Servant (2 ed.), 5660.

10, 11. The duty imposed upon the master by the Employers' Liability Act is a nondelegable duty: *Morgan* v. *Bross*, 64 Or. 63, 68 (129 Pac. 118); *Dickerson* v. *Eastern & Western Lumber Co.*, 79 Or. 281, 287 (155 Pac. 175); it is also a continuing duty: *Dickerson* v. *Eastern & Western Lumber Co.*, 79 Or. 21, 27 (155 Pac. 175); 5 Labatt on Master and Servant (2 ed.), 5665; and therefore when we once determine the duty imposed upon the master we find a duty which is absolute, nondelegable and continuing; the employer cannot absolve himself from the performance of it nor can he delegate it to the employee, but it adheres to him without the possibility of suspension or interruption. Moreover, a transgression of the statute is negligence *per se* and is actionable: *Morgan* v. *Bross*, 64 Or. 63, 70 (129 Pac. 118); *Dorn* v. *Clarke-Woodward Drug Co.*, 65 Or. 516, 519, 621 (133 Pac. 351); *Askatin* v. *McInnis & Reed Co.*, 67 Or. 320, 325 (135 Pac. 322); *Tamm* v. *Sauset*, 67 Or. 292, 297 (135 Pac. 868, L. R. A.

1917D, 988); *McClaugherty* v. *Rogue River Electric Co.,* 73 Or. 135, 142 (140 Pac. 64, 144 Pac. 569); *Dickerson* v. *Eastern & Western Lumber Co.,* 79 Or. 281, 291 (155 Pac. 175); *Cauldwell* v. *Bingham & Shelley Co.,* 84 Or. 257, 268 (155 Pac. 190, 163 Pac. 827).

Much is said by the defendant in his printed brief about relief from liability if the injury was caused by the sole negligence of the plaintiff. Camenzind cannot recover unless the company violated some duty imposed upon it. The plaintiff in his complaint specifies the duty which he claims was violated. The defendant either did or did not violate the duty to guard the machine; if the company did violate that duty the violation is negligence *per se* and is actionable and a claim for damages cannot be barred by either of the defenses of contributory negligence, negligence of a fellow-servant or assumption of risk. If, however, the defendant did not violate the duty specified in the complaint then the defendant and not the plaintiff is entitled to a judgment.

12. The Employers' Liability Act does not say that the employer shall "furnish" or "provide" but it commands that he "shall use" every device which it is practicable to "use." In the New Standard Dictionary the primary meaning of the word "use" is said to be:

"To employ for the accomplishment of a purpose; make use of; as, to use tools."

Webster defines the word thus:

"To make use of; to avail one's self of; to employ."

The Century Dictionary says that the term primarily means

"To employ for the attainment of some purpose or end; avail one's self of."

If a guard is actually employed on a machine we can with propriety say that it is being used, is in use, is used; but if the guard is detached from the machine and left upon the floor where it can be had whenever wanted the most that can be said is that it is available for use and therefore can be used, although not used. In *People* v. *Sommer,* 106 N. Y. Supp. 190, 191 (55 Misc. Rep. 55), it was held that the mere possession by one whose business it was to fill siphons with aerated water for dealers, of a box of siphons found near the filling-machine, but not shown to have been filled by him, was not a "use" of such siphons, within a statute providing that the "use" of a bottle, or siphon by any person, other than the one whose name or mark shall be thereon, without the latter's consent, shall be presumptive evidence of unlawful "use."

13. If the shaper were a machine which did not require readjustment with each succeeding change of work and if it were practicable to attach a guard to the machine and keep it there without removal or readjustment, then it is fair to assume that all parties would concede that it would be the duty of the employer to see that a guard is actually attached to the machine and maintained there. All the decided cases, dealing with statutes akin to ours, which a diligent search has been able to discover, are agreed that it is not enough merely to furnish guards but the employer must attach them; and since his duty is continuous and nondelegable he must maintain them: *Dickerson* v. *Eastern & Western Lumber Co.,* 79 Or. 281, 288 (155 Pac. 175); *Johnson* v. *Far West Lumber Co.,* 47 Wash. 492 (92 Pac. 274); *Baltimore & O. S. W. R. Co.* v. *Cavanaugh,* 35 Ind. App. 32 (71 N. E. 239); *Davidson* v. *Flour City Ornamental Iron Works,* 107 Minn. 17 (119 N. W. 483, 131 Am. St. Rep. 433,

28 L. R. A. (N. S.) 332) ; *Paul Mfg. Co.* v. *Racine,* 43 Ind. App. 695 (88 N. E. 529) ; *Benner* v. *Wallace Lumber & Mfg. Co.,* 55 Wash. 679 (105 Pac. 145, 45 L. R. A. (N. S.) 128) ; *Groves* v. *Wimborne* (1898), 2 Q. B. 402 (67 L. J. Q. B. (N. S.) 862, 79 L. T. (N. S.), 284, 47 Week. Rep. 87) ; 5 Labatt on Master and Servant (2 ed.), 5665.

14. If, in order completely to perform the duty imposed upon him by the statute, the employer must attach and maintain a guard on a machine when it can be kept there constantly without the necessity of removal or readjustment then by the same token, he must in order completely to perform his duty, as to any given piece of work with which it is practicable to use a guard, attach the guard to the machine and see that it is kept there while the servant is engaged with such piece of work. The statute, of course, does not require a guard to be used unless it is practicable to do so. If it be supposed that the employer actually employs a guard when the employee shapes table leg No. 1 but since it is not practicable to employ the guard on table leg No. 2 the employer removes the guard so the employee can shape table leg No. 2: Can it be said that the guard is used when table leg No. 2 is being shaped? Suppose, further, that the employee had been injured while working on table leg No. 2 and had sued the employer for failure to guard the machine: Could the employer say that he had used a guard? Assuredly his answer would be, not that he had used a guard, but that he had not used a guard because it was not practicable to have done so. Again, suppose that the guard had never been attached to the machine but had been placed upon the floor or hung upon the wall and left there while the employee shaped both table legs: Would it be logical and ra-

tional to say that the guard was used on table leg No. 1, for the reason that it could have been used, and that it was not used on table leg No. 2 for the reason that it could not have been used. A guard on the floor is not a guard on the machine. The statute is satisfied with guards on the machine but not with guards on the floor.

It is the duty of the employer to attach and maintain a guard when it is practicable to use a guard; and that duty is absolute, nondelegable and continuing. If an employee, who operates a machine, attaches the guard to the machine he has merely performed the employer's duty; but if the employee fails to attach a guard, though furnished and available, he has merely not done what is not his duty to do but is the duty of the employer to do. The case of *Baltimore & O. S. W. R. Co.* v. *Cavanaugh,* 35 Ind. App. 32 (71 N. E. 239), in all its essential features is the counterpart of the instant case and the conclusion reached there conforms with the conclusion arrived at here. However, it is proper to explain that the force of what is said by the court in *Baltimore & O. S. W. R. Co.* v. *Cavanaugh, supra,* is much impaired by the subsequent opinions in *Pinnell* v. *Cutsinger,* 44 Ind. App. 419 (89 N. E. 493), and in *Cleveland etc. R. Co.* v. *Oesterling,* 182 Ind. 481 (103 N. E. 401). To hold that it can be made the duty of an employee to attach and maintain a guard is to hold that the duty to attach and maintain can be delegated to and imposed upon the employer. It has been argued that this construction of the statute imposes a heavy burden upon the employer. While we do not say that the statute does or does not impose a heavy burden, we do say that if it does rest heavily on the employer the answer to that argument is: We are dealing with the statute as it is

and not as it might have been. It is not for the courts to say whether the statute is or is not wise legislation. Finding a valid statute it is the duty of the courts to enforce it. The trial court properly refused to charge the jury that the defendant performed its duty if it merely furnished guards by placing them within reach of the employee.

15. Among other instructions the Court charged the jury as follows:

"If you shall find in favor of the plaintiff you may allow him such sum as will compensate him for any pain and injury he may have suffered and for any pain and injury growing out of the accident that he may suffer in the future, if you shall find he will suffer any. Also take into consideration any mutilation of his body, any embarrassment that may result from his changed appearance."

It was prejudicial error for the court to instruct the jury that in estimating the damages they could consider "any embarrassment that may result from his changed appearance." There is a conflict of authority as to whether a recovery may be had for mortification and humiliation arising from the contemplation of the disfigurement of the person; but this court has committed itself to the doctrine that humiliation and embarrassment, wholly sentimental, arising from the contemplation of a disfigurement of the person is too remote and indefinite to constitute a possible element of damage: *Maynard* v. *Oregon R. Co.*, 46 Or. 15, 18 (78 Pac. 983, 68 L. R. A. 477); *Boatright* v. *Portland Light & Power Co.*, 68 Or. 26 (135 Pac. 771); 8 R. C. L. 524.

There may be situations where in the very nature of things the employer does his full duty when he merely furnishes safety devices, as possibly in cases like *Heiser* v. *Shasta Water Co.*, 71 Or. 566 (143 Pac.

917), where the devices, consisting of gloves and a mask are not attached to the machine but are designed to be worn by the employee. Another class of cases where the employer need do no more than furnish and provide safety devices may possibly be found where the work done by the employee necessarily requires the exercise of judgment and discretion in the selection of tools and instrumentalities and the manner and mode of performing the work.

In the instant case, the defendant placed the plaintiff at a machine involving a risk and danger. Some and probably most of the work could be done with a guard while some work could not be done with a guard. The defendant could not absolve itself from liability by delegating its duty to the plaintiff. Although the defendant could not strip itself of its duty by transferring that duty to the plaintiff so as to make the latter carry all the risk and while the defendant cannot defeat this action by pleading assumption of risk or contributory negligence, yet the defendant is entitled to plead, for the purpose of reducing recoverable damages, that the plaintiff was guilty of contributory negligence if guards were furnished and known to the plaintiff and he failed to use them.

The judgment is reversed and the cause is remanded for a new trial.    REVERSED AND REMANDED.

McBRIDE, C. J., BENSON and BURNETT, JJ., concur.