Argued June 4; affirmed September 9, 1947

# COX *v.* SANITARIUM CO.
### (184 P. (2d) 386)

*McDannell Brown* (Klepper, Brown & Patterson, of Portland, on brief), for appellant.

*Hugh L. Biggs,* of Portland (M. B. Strayer, of Portland, Hart, Spencer, McCulloch & Rockwood, of Portland, on brief), for respondent.

Before ROSSMAN, Chief Justice, and LUSK, BELT, KELLY, BAILEY, HAY and WINSLOW, Justices.

ROSSMAN, C. J.

This is an appeal by the plaintiff from a judgment of involuntary nonsuit which terminated an action, based upon charges of negligence, in which the relationship of the parties at the time of the injury was that of employee and employer.

The defendant operates a sanitarium in Portland in which it cares for the insane of Alaska. A laundry of a non-commercial character constitutes a part of the sanitarium and in it the work is performed by patients as a phase of their therapy. The plaintiff, as the defendant's employee, supervised the women patients in the laundry and occasionally operated some of the equipment. April 9, 1945, while she was pressing a garment in a steam press a patient tripped upon a floor mat upon which the plaintiff was standing and his knee caused the press to close upon the plaintiff's right forearm. In that way her right hand and forearm were severely burned.

The complaint charged the defendant with negligence in five particulars: (1) In failing to maintain

the place where the plaintiff worked "in a reasonably safe condition"; (2) in failing to "use every device, care and precaution practicable for the safety of the plaintiff"; (3) in failing to install "a guard rail around the steam press"; (4) "in maintaining a worn and defective floor mat"; and (5) in permitting patients whom the defendant knew to be "mentally and physically incompetent" to perform laundry work. The answer denied all averments of negligence and alleged that August 10, 1945, the plaintiff, for a valuable consideration, released the defendant from all claims of liability. The reply charged that the release was procured by false representations.

The appellant submits three assignments of error; they urge that the circuit court erred in holding, if such were in fact its holdings, that (1) there was no evidence of negligence; (2) the plaintiff was a foreman; and (3) the release was valid.

To render the assignments of error understandable, we explain that the plaintiff claims that the mat upon which the patient tripped "was old, worn and curled up at the edges" and that a guard rail for the steam press was not only necessary but practical. The defendant's contention that the plaintiff's status was that of a foreman is based upon §§ 102-1602 and 102-1603, O. C. L. A., which are parts of our Employers' Liability Act.

■ Since the defendant's motion for a nonsuit was allowed, there is before us only evidence presented by the plaintiff. In determining whether or not the circuit court erred, we must accept the evidence as true and view it in the aspect most favorable to the plaintiff. Only two witnesses testified; one was the plaintiff and the other a physician.

The plaintiff described the laundry's size as about the same as that of the courtroom in which she testified. Sixteen patients—men and women—worked in the place. The women were supervised by the plaintiff and the men by her husband, who was also an employee of the defendant. The plaintiff, who was a nurse, assigned the women to their respective tasks, supervised their efforts, gave them needed advice and, upon discovering that any one of them was incompetent, returned her to the wards. Occasionally she operated one of the machines. She had been in the defendant's employ for five years and before entering its service had worked for two years in the Idaho State Hospital. The only items of equipment which were specifically mentioned at the trial were the floor mat and the steam press. The only patient whom the plaintiff specifically mentioned was the one who stumbled upon the mat.

The plaintiff sustained her burn while operating a steam press. She does not claim that the press was old, defective, out of repair or unsuited to the purposes to which it was devoted. The following, taken from her testimony, is substantially the only description of the press afforded by the record:

"The press itself, the bottom part, is about twenty inches long on one end and they taper down to about seven or eight inches on the other end, a sort of shape of an ironing board, and the top is metal, which is heated to a very high degree, and in operating the press you use two buttons which, pressed together, would lower the lid, and the two levers under the buttons would raise the lid back up into position."

We assume that the words "the bottom part" mean the surface upon which the operator placed the garment

which she wished to press. Seemingly it is not heated and resembles an ironing board. The "top" or "lid" is evidently hinged to the frame and descends upon the "bottom part" when the operator presses the buttons. What kind of platform or pedestal the aforementioned parts stand upon, we do not know. Likewise we know nothing about the height of the machine. The size, location and character of the buttons and levers is not revealed by the record. Whether the buttons were in a recessed or exposed area, we can not ascertain from anything before us. It may be, so far as the evidence shows, that "the two levers under the buttons" constituted a shield or protection for the buttons.

After the garment which the operator laid upon the bottom part was pressed, she evidently moved the release levers and thereupon the upper part returned to its former position. The plaintiff, referring to the buttons, said:

"They were very touchy; just a little pressure would lower the lid * * * . When your buttons are pressed, the lid comes down very quickly, closes together, a very sudden motion."

We mentioned the fact that the complaint, in charging the defendant with negligence, states that the defendant should have installed "a guard rail around the steam press." The answer denied that averment. The sole evidence upon that issue is the following which was given by the plaintiff upon direct examination:

"Q. Are there any guard rails or protective devices around these?
"A. No."

That is the only testimony upon the subject; there is nothing more. The plaintiff did not even intimate that

a guard rail or protective device should have been installed or that either would have prevented the mishap which caused her injury. No evidence was presented indicating what sort of guard rail should have been installed. Since the witnesses failed to describe the buttons or mention the place upon the press where they were located, it is impossible to know where a rail should have been built. Whether or not any press anywhere possesses a guard rail and whether or not anyone had previously been injured through the lack of a protective device were not mentioned at the trial. In view of the fact that the single question and answer just quoted constitute the sole evidence about a guard rail and protective device, it follows that there is no evidence in the transcript showing whether it would be practical to place a guard rail upon a press, and likewise whether such a rail would detract from the efficiency of the machine.

It will be recalled that one of the patients stumbled when he was near the press and that his knee touched the buttons, thereby causing the lid to descend. At that moment the plaintiff was in front of the machine and was standing upon an article which she described as "a corrugated mat, partly rubberized, partly metal." Its size was two and one-half by four feet and its thickness was possibly an inch. Whenever the floor of the laundry was washed the edges of the mats curled up, according to the plaintiff, "maybe about an inch or so, a quarter of an inch." At all other times the mats lay flat on the floor. The tendency of the mats to curl when the floor was wet was known to the plaintiff, for she explained:

"We wash the laundry floor and these mats would curl. You would have to turn them over to keep them laying straight. * * * The water will

kind of draw the rubber up and then if you turn it over it will flatten it out again.''

Evidently the two sides of the mats were alike and the remedy for the curled-up condition was to turn over the mat. Nothing else needed to be done. The plaintiff's injury occurred on a Monday morning. The preceding Saturday the patients had washed the floor. The plaintiff testified that Monday morning, ''I didn't go around turning the mats over.'' Although she said that the mat upon which she was standing at the time of her injury had been in use for three or four years, she did not claim that it was defective, needed repair, or should have been discarded. Whenever she needed anything for the laundry she obtained it from the storeroom. She never presented a requisition for a new mat and did not know whether a supply was kept in the storeroom. She added: ''I had never inquired as to whether they had any more, because we had plenty to go around.'' She never reported anything in the laundry defective because ''there was nothing wrong that I knew of.'' If mats which would not curl at the edges when laid upon damp floors were available upon the market, that fact was not voiced by any witness.

It will be recalled that one of the specifications of negligence says that the defendant permitted patients to assist in the laundry who were ''mentally and physically incompetent.'' The plaintiff conceded that the work which the patients performed in the laundry was a part of the treatment accorded them by the sanitarium. The brief of her counsel says that ''employment therapy in which the patients work in safe surroundings * * * would be an entirely reasonable procedure.'' So far as the evidence discloses, the plaintiff and her husband were the only persons, apart from

the patients, who performed functions in the laundry. It is clear that the inmates who worked in the laundry were not employees, and that their status was fundamentally different from that of the plaintiff and her husband. The latter two were the defendant's employees and worked for wages. Their duties were to supervise the inmates. The inmates who were assigned to the laundry were sent there because the psychiatrist, whom the plaintiff termed "the Government doctor," believed that the work would be beneficial to them. They were not employees. Each morning the plaintiff went to the wards and got them. From then on and until she returned them to the wards they were in her care and were her charges. Of course, they were mentally incompetent. Had they been normal they would not have been adjudged insane, and the plaintiff would not have been entrusted with their supervision.

The patient who tripped upon the mat was one by the name of Leopold Meany. The plaintiff described him as partially deaf and highly excitable. He was 61 years of age. She said that "he liked to talk and throw his arms around." Normally he worked upon one of the presses. The plaintiff added: "He tried to the best of his ability to do what you asked of him." Nothing in the record indicates that Leopold was inclined to fall or stumble. So far as we know, his mental derangement was not the cause of his tripping upon the mat.

We shall now consider the first assignment of error, which charges that the trial court erred in holding that the evidence failed to prove negligence on the defendant's part. We believe that the foregoing review of the evidence affords a sufficient background for the consideration of this assignment of error. It will be

recalled that the plaintiff claims that the defendant was negligent in the following particulars: (1) In having failed to provide the steam press with a safeguard; (2) in maintaining upon the floor a defective mat; and (3) in permitting mentally defective patients to be occupied in the laundry.

It is obvious that the plaintiff invokes the aid of the Employers' Liability Act, §§ 102-1601 to 102-1606, O. C. L. A., particularly of that part of § 102-1601 which says:

> " * * * all dangerous machinery shall be securely covered and protected to the fullest extent that the proper operation of the machinery permits, * * * ; and generally, all owners, * * * having charge of, or responsible for, any work involving a risk or danger * * * shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus * * * ."

In *Camenzind v. Freeland Furniture Co.*, 89 Or. 158, 174 P. 139, the act just mentioned received careful analysis. From that decision we quote:

> "The complaint alleges that the defendant failed to use every device which it was practicable to use and that when fully equipped the machine has a safety-guard attached to it which does not in any manner interfere with the efficiency of the machine. The defendant denied this allegation and hence the pleadings raised an issue which required evidence. In some states the burden is upon the employer to show that a guard is impracticable: Redington v. Blue & Raferty, 168 Iowa, 34 (149 N. W. 933); Gross v. Eagle Wheel Mfg. Co., 252 Pa. 361, (97 Atl. 457; Caspar v. Lewin, 82 Kan. 604, 635 (109 Pac. 657; 49 L. R. A. (N.S.) 526); but in this jurisdiction the burden is upon the plaintiff to show that it was

practicable to guard the machine: Cameron v. Pacific Lime & Gypsum Co., 73 Or. 510, 517, (144 Pac. 446, Ann. Cas. 1916E, 769).''

■ The brief of the appellant's counsel, after acknowledging that this court has held that the burden is upon the plaintiff to prove the practical character of the safeguards which he claims should have been installed, declares: ''This is contrary to the general rule (see 35 Am. Jur., Master and Servant, § 493).'' Section 493 of 35 Am. Jur., Master and Servant, contains two sentences upon the subject of burden of proof under Employers' Liability acts. One of them follows:

> ''Where the action is predicated upon the Employers' Liability Act, the plaintiff assumes the burden of proving that the injury to the employee was caused by a defect in the employer's 'ways, works, machinery, or plant' within the meaning of that Act.''

Obviously, that statement is contrary to the plaintiff's contention. The other sentence reads:

> ''In an action for injury or death of a servant under a factory act requiring certain safeguards to machinery, where practicable, and giving a right of action for death or injury in any case wherein the absence of the safeguards or precautions required by the act shall directly contribute thereto, it is not necessary for the plaintiff to prove in the first instance that it was practicable to guard the machinery which caused the death.''

The only authority cited in support of that statement is *Caspar v. Lewin*, 82 Kan. 604, 83 Kan. 799, 109 P. 657, 49 L. R. A. (N. S.) 526. By reverting to our quotation from the Camenzind opinion, it will be observed that it cited the Kansas decision in support of the statement: ''In some states the burden is upon the

employer to show that a guard is impractical." It, however, declined to follow the Kansas decision, which was governed by § 6 of § 4680, General Statutes of Kansas, 1909. That statute, according to the decision, "makes it sufficient, in order to establish liability, for the plaintiff to prove in the first instance that death or injury resulted in consequence of failure to provide the required safeguards." The court explained:

> "The legislature was evidently moved by the fact that very often an injured employee is not competent to demonstrate the practicability of providing safeguards, and may not be able to command the expert evidence necessary to do so."

We have read the Kansas act and find in it a basis for the court's interpretation. Oregon has nothing comparable to § 6, and we believe that without legislative sanction we are not authorized to depart from the general rule which places upon the plaintiff the burden of proof. We are satisfied that in actions brought under our Employers' Liability Act and predicated upon a contention that the employer should have installed a safeguard, the burden rests upon the plaintiff, not only to point out the safeguard and show that its installation would have prevented the accident, but also to prove the practicality of the device.

■ It is clear that the record contains no evidence showing that it would have been practical to have installed a guard rail or protective device upon the press. We do not mean to imply that the plaintiff should have come forth with a blueprint of a protective device drawn to scale, but she should have presented substantial evidence showing that a protective device was necessary and practical and that its absence was the proximate cause of her injury. She went no further

than to prove her injury and the lack of a safeguard. Without knowing what sort of protective device the plaintiff had in mind, no one can say that she discharged the burden which rested upon her.

■ We are also of the opinion that the evidence fails to prove any negligence concerning the floor mat. It does not show that the mat was old, worn, obsolete or out of repair. Concerning mats, the plaintiff testified: "We had plenty to go around. * * * There was nothing wrong that I knew of." So far as the evidence goes, the defendant was not negligent concerning that item; it discharged its duty in full concerning the mat.

■ We come now to the phase of the charges of negligence which pertain to the presence of the patients in the laundry. The averment of negligence which is based upon that fact reads as follows:

"In permitting patients at its place of business to assist in the plaintiff's work when at the time and place defendant knew the said patients were mentally and physically incompetent to do so and liable to cause injury to persons and particularly the plaintiff."

The evidence does not bear out that statement. The latter appears to be a misinterpretation of the situation in the laundry. The patients did not assist the plaintiff in the performance of anything. Her primary duty was not to do laundry work, but to supervise the patients in the performance of the tasks which she assigned to them. In truth, she did not assist them in the performance of any labor, for the laundry was not a commercial establishment where work was performed by employees who worked for wages; it was a room in the defendant's institution in which a score or so of unfortunate human beings could occupy themselves

under competent guidance in the performance of simple tasks and thus keep alive the flickering spark of intelligence which still lingered on in them. They were not there as employees, but as patients who were receiving psychiatric attention. The work which they performed was a phase of the therapeutic treatment which the institution afforded. The plaintiff was one of their overseers and is no more at liberty to complain of their deranged minds than is a seaman, who accepts employment upon the high seas, free to complain of the salty character of the ocean.

The evidence fails to show that Leopold's unfortunate mental ailment in any way affected his walking at the moment when he tripped upon the floor mat. Throughout we have been assuming that he tripped—although the plaintiff's back was turned to him as he approached her and she was not sure of what actually occurred. But, assuming that he tripped, it may be that a normal person would have done no differently at the moment when the plaintiff met with her mishap. In *Ferretti v. Southern Pacific Co.*, 154 Or. 97, 57 P. (2d) 1280, it is said:

> "Liability cannot be predicated upon the mere fact that the work involved a risk or danger. The plaintiff must go further and show a breach of duty on the part of the company."

We know of no breach of duty on the defendant's part revealed by the evidence concerning the character of those who were sent to the laundry room.

The first assignment of error possesses no merit. The circuit court did not err when it entered the attacked judgment.

The decree of the circuit court is affirmed.